[No. E028833. Fourth Dist., Div. Two. May 14, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS MARTIN, Defendant and Appellant.

**COUNSEL**

Donald B. Marks for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Steven T. Oetting and Lora Fox Martin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOLLENHORST, Acting P. J.**—A jury convicted defendant Luis Martin of one count of first degree murder (Pen. Code, § 187, subd. (a))[1] and found that he personally used a firearm in committing the crime (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)). Having been sentenced to a term of 35 years to life in prison, he appeals.

The sole issue on appeal is defendant's contention that his constitutional rights were violated when the police arranged for his girlfriend to secretly record inculpatory telephone conversations while he was represented by counsel, in violation of his constitutional right to counsel, as stated in *Massiah v. United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and its progeny.

### FACTS

Defendant Martin is one of the owners of Value Produce, a wholesale grocery company in downtown Los Angeles. In 1998, he offered a job to the victim, Jose Ramon. Mr. Ramon was the boyfriend of Maricela Vargas. Ms. Vargas was a friend of Celia Camolinga, defendant's girlfriend.

Mr. Ramon was last seen at work at Value Produce between 3:00 a.m. and 3:15 a.m. on November 25, 1998.[2] His body was found at five minutes before 6:00 a.m. on the same morning on a foggy road in Chino. He had been shot at close range behind his right ear.

Defendant was also at work that morning, and he was last seen about the same time as the victim. The prosecution relied on his cell phone records to establish his location during the crucial time period. Those records showed he made a call which was handled by a cell tower in Monterey Park at 3:34 a.m. The tower is located next to the 60 freeway in Paramount. The next call was made in Chino at 4:22 a.m. The Chino cell tower is located about four miles from where the body was found. Subsequent calls were handled progressively by cell towers to the west of Chino, ending with a call near his girlfriend's apartment in Calabasas at 5:15 a.m. The girlfriend, Ms. Camolinga, testified that defendant arrived at her apartment after 5:00 a.m. and left at 7:00 a.m.

After the preliminary hearing, Ms. Camolinga taped several hours of telephone conversations with defendant, as described below. Transcripts of

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]Defendant's brother was sure he had seen defendant and the victim at work at that time. He also testified he had seen them later, and estimated the time at between 4:00 a.m. and 4:20 a.m. However, he was not sure of the latter time.

the tapes, which were incriminating, were read to the jury. Since forensic evidence was inconclusive, the taped conversations were very prejudicial to defendant.

In addition, Ms. Camolinga testified that defendant confessed the crime to her in person, and she supplied a motive for the crime. She testified that defendant told her that he was very angry with Mr. Ramon because Mr. Ramon had told defendant's wife about his relationship with Ms. Camolinga.[3]

Ms. Camolinga also testified that defendant was very controlling and jealous of her, particularly when he discovered that she was dating another man in her home town of Manzanillo, Mexico. Maricela Vargas gave another possible motive for the killing when she testified that defendant was angry with Mr. Ramon for not telling him about Ms. Camolinga's other relationship.

In closing argument, the prosecutor relied on a third possible motive based on defendant's taped statements. That possible motive was that defendant was angry that Mr. Ramon had discussed defendant's relationship with Ms. Camolinga with people at work, and had thereby threatened the relationship.

The defense was that defendant had not committed the crime. Specifically, the defense produced forensic evidence that the victim was killed immediately before the body was discovered at 5:55 a.m. At that time, defendant was in Calabasas. However, the defense never explained what the defendant was doing in Chino at 4:22 a.m. and the jury apparently believed the prosecution's theory that the victim was killed before that time.

## The Massiah Motion

Prior to trial, defendant filed a motion to exclude from evidence transcripts of his taped telephone conversations with Ms. Camolinga. The motion asserted that the conversations were obtained in violation of his right to counsel under *Massiah v. United States, supra,* 377 U.S. 201.

In *Massiah,* the Supreme Court said: "We hold that the petitioner was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (*Massiah v. United States, supra,* 377 U.S. 201, 206 [84 S.Ct. 1199, 1203].)

---

[3]Ms. Camolinga also testified that the reason was absurd because defendant had previously told her that his wife knew he had a girlfriend.

■ Accordingly, our Supreme Court has said: "In determining the merits of a *Massiah* claim, the essential inquiry is whether the government intentionally created a situation likely to induce the accused to make incriminating statements without the assistance of counsel. [Citations.] . . . To prevail on such a claim, the defendant must show (1) that the informant acted as a government agent at the behest of the police in accordance with a preexisting agreement and with the expectation of receiving a benefit or advantage, and (2) that the informant deliberately elicited incriminating statements." (*People v. Frye* (1998) 18 Cal.4th 894, 993 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

"Whether to allow an informant's testimony is 'an essentially factual question, and we review it on a deferential standard.' [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1247-1248 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)

We review the evidence presented at the hearing on the motion with these principles in mind.

### FACTS RELATING TO THE MASSIAH MOTION[4]

A hearing was held on defendant's *Massiah* motion, and extensive testimony was heard. The trial court read and considered the transcripts of the recorded conversations as "circumstantial evidence or indirect evidence of the fact of whether or not there was actually some coercion, intimidation, solicitation, whatever you want to call it, that reflects on my ultimate decision . . . ."

Mr. Ramon was murdered on November 25, 1998. Defendant was arrested for the crime on December 17, 1998. A preliminary hearing was held in early February 1999. Defendant was represented by his present counsel at the preliminary hearing and at all subsequent times.[5] Subsequently, he was released on a million-dollar bail bond.

Ms. Camolinga testified that defendant had her followed at her home in Manzanillo, Mexico. When she came to California, he showed her a photo album of her daily activities in Mexico. He would also call her and tell her what she and her daughters were wearing that day.

---

[4]The facts in this part are primarily taken from the hearing on the *Massiah* motion. However, after receiving our decision denying his petition for writ of mandate (*Martin v. Superior Court* (Oct. 12, 2000, E028082) [nonpub. opn.]), defendant renewed his motion at trial. Facts elicited at trial may therefore be relevant to our decision on this issue.

[5]Ms. Camolinga did not testify at the preliminary hearing. She later testified that she had refused to leave Mexico because defendant had threatened her, and two men had accosted her with a gun in Mexico and threatened her further.

After Mr. Ramon was killed, Ms. Camolinga began dating a man named Omar Cosio. She became pregnant. Defendant learned of the pregnancy and threatened and coerced her to move to the town of Ceres in the San Jose area.[6] She moved there with her daughters on June 1, 1999. Defendant paid for the tickets and bought a home for her that was about a block from her brother's home. Defendant furnished the home and paid all the household expenses. He called her constantly during the day and would visit her every weekend.

Ms. Camolinga testified she moved to Ceres and remained there because of defendant's threats against her and her daughters. As soon as she arrived in Ceres, she obtained an abortion. She testified she did not want to have an abortion, but did so because defendant threatened her daughters and Mr. Cosio: "I believed [defendant] was going to do [Mr. Cosio] harm. I believed that it was in my hands to save them [by having the abortion]." Nevertheless, Mr. Cosio was murdered on June 22, 1999.

Ms. Camolinga testified she was very frightened because Mr. Ramon and Mr. Cosio had been murdered and she thought defendant was going to kill her or her daughters next. Accordingly, she went to the Ceres Police Department on August 12, 1999. The Ceres officer called Detective Wolf, the investigating officer at the San Bernardino Police Department. Detective Wolf and another officer immediately drove to Ceres and talked to Ms. Camolinga the next day. Detective Wolf discussed the witness protection program with her, but did not say anything about recording conversations.

When Detective Wolf returned to San Bernardino, he discussed the possibility of recording defendant's conversations with his colleagues and a deputy district attorney. He stated that he was investigating the crime of intimidating a witness. A decision was made to provide tape-recording equipment to Ms. Camolinga. Detective Wolf asked her if she would record the conversations, and she agreed to do so. The Ceres officers gave her the equipment, told her how to install it, and instructed her to turn it on when defendant called. Detective Wolf denied that any other instructions or list of questions was given to her, but stated that his concern was to document the threats made to her at the time. He agreed, however, that he did not tell her to avoid discussion of the details of the murder of Mr. Ramon.

Ms. Camolinga began recording telephone conversations with defendant on August 20, 1999. She turned out to be a very good questioner. As the trial court ultimately found, she was a very active interrogator who conducted a

---

[6]Ms. Camolinga testified that she talked to a Mexican judge about defendant's threats and was told she needed proof that defendant had threatened her.

very sophisticated interrogation on her own. Her questioning was not limited to threats against her, but delved deep into defendant's feelings and actions concerning the charged crime, the murder of Mr. Ramon.

As a result of the tapes, defendant's bail was revoked and he was remanded to custody on September 2, 1999. In its motion, the prosecution asked that bail be denied because Ms. Camolinga had been threatened and because defendant had left the country without permission while on bail, i.e., he was suspected of killing Mr. Cosio in Mexico City while on bail.

## THE TRIAL COURT'S DECISION

The trial court's decision rests primarily on the case of *People v. Wojt-kowski* (1985) 167 Cal.App.3d 1077 [213 Cal.Rptr. 846]. In that case, the defendant was arrested for spousal battery and related charges. The defendant called his wife several times and his wife recorded the conversations. A detective had installed a recorder on her telephone and she was advised to record any conversation with the defendant. The police told her that the purpose of the recording was to locate the defendant, to allow them to protect her if the defendant threatened her, and to record the defendant's admissions, if any. (*Id.* at p. 1079.)

The defendant asserted that the recordings violated his *Miranda*[7] and *Massiah* rights. The appellate court disagreed, noting that the relationship between the defendant and his wife was adversarial because he knew she would be the main witness against him. It said: "No breach of trust by a false friend is involved when an accused initiates a conversation to intimidate the prosecuting witness against him from testifying." (*People v. Wojtkowski, supra,* 167 Cal.App.3d 1077, 1082.) The court also found that the police "did not intentionally create a situation where defendant was likely to make incriminating statements." (*Ibid.*) Finally, the court found that the defendant had no reasonable expectation of privacy in talking to the prosecution witness because the defendant does not have "a constitutionally protected expectation that the victim he is trying to intimidate will not betray him by recording the conversation." (*Id.* at p. 1083.) Accordingly, the court found no *Miranda* or *Massiah* violation.

In analyzing the issue, the trial court here focused on the conduct of the parties and found (1) Ms. Camolinga voluntarily contacted the police; (2) she was in fear for her life, and the lives of her daughters, and asked for help from the police; (3) the police only provided the recording equipment;[8] (4) the police did not give her any instructions or suggested questions; (5) the interrogation made by Ms. Camolinga was her own idea; and (6) defendant voluntarily called and talked to her, thus waiving his right to counsel.

---

[7]*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

[8]The police also assisted her by subsequently placing her in a witness protection program.

Accordingly, the trial court concluded that "the witness in this case did not act as an agent of the government in attempting to elicit statements regardless of whether the statements were elicited for purposes of gathering information against the charges pending or for future threats." The court noted that the only thing the officers did was to provide the recording equipment. Obviously, there would have been no agency issue if Ms. Camolinga had provided her own equipment and made the same recordings. Based on these factors, and *Wojtkowski*, the trial court denied the motion to suppress the recorded statements.

## DISCUSSION

Defendant argues (1) the trial court erred in its waiver determination because Ms. Camolinga presented herself as a "false friend" and there was no evidence that defendant did not trust her; (2) the trial court erred in determining that Ms. Camolinga was not an agent of the police; (3) the evidence shows an agreement between the police and Ms. Camolinga to elicit inculpatory statements; (4) the police created a situation likely to induce defendant to make incriminating statements; and (5) the statements are inadmissible even if there was a legitimate reason for recording defendant's conversations.

1. *The Waiver Determination.*

As noted above, the trial court found that defendant "apparently knowingly and intelligently waived [his Sixth Amendment] right and chose to talk to this individual who he repeatedly said that I don't trust and the phone can be tapped."

Defendant disagrees, finding that, because of their long romantic relationship, Ms. Camolinga presented herself as a "false friend" and used that status to extract admissions from defendant. In other words, "Ms. Camolinga's basic approach was to indicate to [defendant] that in order for their relationship to continue she must be able to trust him, and therefore, must know everything concerning the murder of Jose Ramon."

The "false friend" terminology was used at least as far back as 1951, when Justice Jackson said: "The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." (*On Lee v. United States* (1952) 343 U.S. 747, 757 [72 S.Ct. 967, 973, 96 L.Ed. 1270].) Later, in a classic false friend case, Chief Justice Warren said: "Petitioner was apparently unaware of John Gay's famous couplet: [¶] 'An open foe may prove a curse, But a pretended friend is worse,' and he yielded to his false friend's entreaties." (*Spano v. New York* (1959) 360 U.S. 315, 323 [79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265].) *Spano* was the basis for *Massiah*. (*Massiah v. United States, supra,* 377 U.S. 201, 204-205 [84 S.Ct. 1199, 1201-1203].)

We think it is relatively clear here that Ms. Camolinga was indeed a false friend in the sense that she used her relationship with defendant to elicit inculpatory admissions. Contrary to the trial court's decision, we find that defendant clearly trusted her and confided in her. But that does not end the matter. As discussed below, we must also determine whether Ms. Camolinga was used as a false friend by the police and whether, as *Wojtkowski* holds, there is no breach of trust by a false friend "when an accused initiates a conversation to intimidate the prosecuting witness against him from testifying." (*People v. Wojtkowski, supra,* 167 Cal.App.3d 1077, 1082.)

Respondent urges that Ms. Camolinga was not a false friend because their relationship became adversarial, and it became adversarial because defendant knew that Ms. Camolinga was the prime witness against him. But defendant had already been successful in keeping Ms. Camolinga from testifying at the preliminary hearing, and his success might have led him to believe he could trust her and that she would not testify against him at trial. However, he did indicate an awareness that their telephone conversations might be taped, and this factor tends to establish that the statements were made voluntarily in spite of the risk. It also indicates that defendant had no real expectation of privacy in their conversations. (*People v. Wojtkowski, supra,* 167 Cal.App.3d 1077, 1083.)

We agree with defendant and the trial court that Ms. Camolinga engaged in a sophisticated interrogation of defendant. Defendant uses this fact to distinguish the case from *Wojtkowski* because, in that case, the wife did not engage in such questioning and did not make comments to elicit statements from the defendant. (*People v. Wojtkowski, supra,* 167 Cal.App.3d 1077, 1082.) Although this is a distinguishing factor, defendant has not established that the questioning was deliberately elicited by Ms. Camolinga acting as an agent of the government. ■ "If an informant 'acts on his own initiative,' even if he interrogates the accused, 'the government may not be said to have deliberately elicited the statements.' [Citations.]" (*People v. Fairbank, supra,* 16 Cal.4th 1223, 1247.) In other words, "[t]he police simply made use of [the informant's] own motivation to inform on defendant, a technique we found not to be a knowing subversion of the defendant's right to counsel . . . ." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [278 Cal.Rptr. 640, 805 P.2d 899].)

■ We therefore disagree with the trial court on the waiver issue: "Moreover, the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government. [Citation.]" (*United States v. Henry* (1980) 447 U.S. 264, 273 [100 S.Ct. 2183, 2188, 65

L.Ed.2d 115].) Thus, defendant did not waive his Sixth Amendment rights by talking with Ms. Camolinga if she was acting for the government. We therefore turn to that issue.

## 2. *The Agency Determination.*

Defendant argues the trial court erred in finding that Ms. Camolinga was not an agent of the police. He emphasizes Ms. Camolinga's testimony in which she stated that she went to the Ceres Police Department in order to document defendant's threats against her. Although defendant claims that no direct threats were recorded, Ms. Camolinga testified that she was recording the conversations to document her fear of defendant and the threats he had been making. She stated: "[A]fter hearing what he told me about the death of Jose and Omar, I was afraid for my daughters and for me, for my life, because he showed me he had no heart or fear of anything." In other words, she considered the murders threatening to her.

Defendant therefore contends that Ms. Camolinga was acting as the agent for the police because the police knew that the threats against her consisted of the murders themselves. Thus, any inquiry into the threats would necessarily be an impermissible inquiry into the facts of the underlying crime.

As defendant acknowledges, Detective Wolf testified that he thought that *Massiah* was inapplicable because defendant was being investigated for the crime of intimidating a witness. He also testified that the only instruction given to Ms. Camolinga was to turn on the tape recorder when defendant called.

Defendant cites *Maine v. Moulton* (1985) 474 U.S. 159 [106 S.Ct. 477, 88 L.Ed.2d 481]. In that case, the Supreme Court reaffirmed that "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." (*Id.* at p. 176 [106 S.Ct. at p. 487], fn. omitted.) The court rejected the argument that the defendant's Sixth Amendment rights were not violated because the defendant initiated a meeting with his codefendant which was taped by the police with the codefendant's help. It found the state has an "affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right." (*Id.* at p. 176 [106 S.Ct. at p. 487].)

The issue is whether there was an agreement to knowingly circumvent defendant's Sixth Amendment rights in the present case. Defendant cites *People v. Frye, supra,* 18 Cal.4th 894. But in *Frye,* our Supreme Court found

no such violation. It noted that there was no evidence that the defendant's alleged accomplice was acting as a government agent merely because the police arranged for her to meet with the defendant. (*Id.* at p. 993.) There was also no evidence of a working relationship between the accomplice and the police, and no evidence that the police asked the accomplice to obtain information from the defendant in return for not filing charges against the accomplice.

In *Frye*, as in the present case, there is simply no evidence that the government sought to obtain incriminating evidence against the defendant by knowingly circumventing his right to counsel. (*People v. Frye, supra*, 18 Cal.4th 894, 993.) In other words, neither Frye nor defendant here showed "that the informant acted as a government agent at the behest of the police in accordance with a preexisting agreement and with the expectation of receiving a benefit or advantage . . . ." (*Ibid.*)

In *Frye*, the police merely facilitated communication by arranging for the accomplice to meet with the defendant in jail. In the present case, the police only facilitated the tape recording of the telephone conversations by providing a tape recorder. Under *Frye*, that fact alone is insufficient to show a knowing circumvention of defendant's Sixth Amendment right to counsel. Defendant has failed to show that Ms. Camolinga was acting as the agent of the officers.

### 3. *The Alleged Agreement.*

█ Defendant also argues that the evidence indicates there was an agreement between Ms. Camolinga and the police to elicit statements from defendant with regard to the pending murder case. He cites *In re Neely* (1993) 6 Cal.4th 901 [26 Cal.Rptr.2d 203, 864 P.2d 474]. In that case, our Supreme Court, discussing the merits of a *Massiah* claim, said: "In order for there to be a preexisting arrangement, however, it need not be explicit or formal, but may be 'inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct' over a period of time. [Citation.] Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government. [Citation.]" (*Neely, supra*, at p. 915.)

Defendant argues that the testimony here supports his conclusion that "the only logical inference that can be derived from the facts adduced at the pretrial hearing is that there was an agreement between the police and Ms.

Camolinga to gather information regarding the murder of Jose Ramon." While we agree that this is a permissible inference, it is not the only permissible inference that can be drawn from the testimony. The trial court expressly found that the police did not initiate the contact with Ms. Camolinga, and that the conduct of the police in furnishing the tape recorder did not amount to interference or participation by the police which would create an agency relationship. It also found that "the witness in this case did not act as an agent of the government in attempting to elicit statements regardless of whether the statements were elicited for purposes of gathering information against the charges pending or for future threats." This is a permissible interpretation of the evidence. We therefore defer to the trial court's implied factual finding that defendant failed to show that Ms. Camolinga was acting as a government agent. The trial court could properly conclude that defendant failed to show an impermissible agreement between the police and Ms. Camolinga. It could also reasonably conclude that the evidence introduced at the hearing on the motion, and at trial, does not support an agency determination. (*People v. Fairbank, supra,* 16 Cal.4th 1223, 1247-1248.)

### 4. *The Impermissible Creating of a Situation Likely to Induce Incriminating Statements.*

■ Under this heading, defendant discusses another leading case in this area, *United States v. Henry, supra,* 447 U.S. 264. In that case, officers contacted an informant who had previously been paid for information, and who was in the same jail as defendant Henry. The officers placed the informant in the same cell as the defendant, and instructed the informant "to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." (*Id.* at p. 266 [100 S.Ct. at p. 2185].) The informant elicited incriminating information and testified against defendant Henry at trial. The informant was paid for his information. (*Id.* at pp. 266-267 [100 S.Ct. at pp. 2184-2185].)

The issue in *Henry* was whether the officers had "deliberately elicited" the incriminating statements. The Supreme Court found three factors important: (1) the informant was paid for his information; (2) the informant was ostensibly only a fellow inmate; and (3) the conversations occurred while Henry was in custody and under indictment. (*United States v. Henry, supra,* 447 U.S. 264, 270 [100 S.Ct. 2183, 2186-2187].) Applying these factors, the court found that the court of appeals correctly held that Henry's statements to the informant should not have been admitted at trial: "By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." (*Id.* at p. 274 [100 S.Ct. at p. 2189], fn. omitted.)

The present case is somewhat different. First, there was no evidence that Ms. Camolinga was acting under instructions or that she was a paid informant. The only evidence in this regard was that the officers only told her to turn on the tape recorder whenever defendant called.

Second, defendant was out of jail on bail in late August 1999, when he called Ms. Camolinga and she recorded the calls. In *Henry*, the court treated incarceration as an important factor because "confinement may bring into play subtle influences that will make [defendant] particularly susceptible to the ploys of undercover Government agents. [In this case,] the incriminating conversations between [defendant] and [the informant] were facilitated by [the informant's] conduct and apparent status as a person sharing a common plight." (*United States v. Henry, supra,* 447 U.S. 264, 274 [100 S.Ct. 2183, 2188-2189].) In other words, "the fact of custody bears on whether the Government 'deliberately elicited' the incriminating statements from Henry." (*Id.* at pp. 273-274, fn. 11 [100 S.Ct. at pp. 2188-2189].)

Defendant's argument is that the statements were deliberately elicited because the officers must have known that the recording of defendant's conversations would not be limited to threats or intimidation of a witness, but would almost necessarily include conversations about the murder of Mr. Ramon. As *Henry* states: "Even if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." (*United States v. Henry, supra,* 447 U.S. 264, 271 [100 S.Ct. 2185, 2187].) Thus, defendant argues that the officers here must have known that furnishing the tape recorder would likely lead to the obtaining of inculpatory evidence on the charged crime. Since Ms. Camolinga thought that the threats to her were conveyed by defendant's statements about the charged offense, "to prove the threats she must prove the murder." In other words, the officers deliberately elicited incriminating statements from the accused by giving Ms. Camolinga the recording equipment.

Although defendant's argument does make this a closer case, we are not persuaded. The other factors stated in *Henry* weigh against defendant's position, and we are not convinced that the mere furnishing of recording equipment, without more, is a violation of *Henry*. The police did nothing more than facilitate the recording of the conversation. As discussed above, such facilitation is not enough to show a knowing circumvention of defendant's Sixth Amendment right to counsel. (*People v. Frye, supra,* 18 Cal.4th 894, 993.)

Our record supports the trial court's position that Ms. Camolinga undertook her interrogation on her own, and the officers did not know that she

would do so. As discussed above, she was not acting as the agent of the officers in eliciting information and the fact that she acted on her own initiative supports the conclusion that the government did not deliberately elicit the incriminating statements. (*People v. Fairbank, supra,* 16 Cal.4th 1223, 1247.)

5. *Admissibility of the Statements.*

For his final argument, defendant returns to *Maine v. Moulton, supra,* 474 U.S. 159. In the final portion of that opinion, the Supreme Court rejected the argument that the taping was permissible because the police were investigating an alleged plot to kill a witness. (*Id.* at pp. 178-180 [106 S.Ct. at pp. 488-489].) Although it was entirely proper to investigate the new crime, the defendant's incriminating statements regarding the pending charges could not be used as evidence against him at the trial of those charges. (*Id.* at p. 179 [106 S.Ct. at pp. 488-489].) The court reaffirmed that such evidence was inadmissible "if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." (*Id.* at p. 180 [106 S.Ct. at p. 489], fn. omitted.)

Defendant argues that this is precisely the situation here. Assuming the police were entitled to investigate the new crime of intimidating a witness by recording defendant's telephone conversations, defendant argues that his statements concerning Mr. Ramon's murder, made during those recorded conversations, should have been excluded. He emphasizes that, because Ms. Camolinga believed she had to obtain information about Mr. Ramon's murder in order to prove her own intimidation, it was likely the details of the murder of Mr. Ramon would be discussed in the telephone conversations. He thus finds his statements should have been excluded from the trial.

We disagree. The Supreme Court has recently reiterated that the Sixth Amendment right to counsel is offense specific. (*Texas v. Cobb* (2001) 532 U.S. 162 [121 S.Ct. 1335, 149 L.Ed.2d 321].) The court rejected the position that the right to counsel attaches not only to the offense charged but also to other offenses which are closely related factually to the charged offense. It also held that the offense charged "does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* [*v. United States* (1932) 284 U.S. 299 [52 S.Ct. 180, 76 L.Ed. 306]] test." (532 U.S. 162, 173 [121 S.Ct. 1335, 1343], fn. omitted.)

Our Supreme Court has followed this decision and also held that the Sixth Amendment right only attaches to the charged offenses. (*People v. Slayton*

(2001) 26 Cal.4th 1076 [112 Cal.Rptr.2d 561, 32 P.3d 1073].) Thus, defendant's Sixth Amendment right to counsel had not attached with respect to the uncharged crime of witness intimidation. This is true even if the facts relating to the witness intimidation were inextricably intertwined or closely related to the charged offense of murder. (*Slayton, supra,* at p. 1082.)

The issue raised by defendant here is whether the officers knowingly circumvented defendant's Sixth Amendment rights. This argument is based on *Moulton*'s holding that the officers must not knowingly circumvent his right to counsel: "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [Citation.] However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." (*Maine v. Moulton, supra,* 474 U.S. 159, 176 [106 S.Ct. 477, 487], fn. omitted.)

Defendant relies on the latter portion of the *Moulton* opinion, in which the prosecution argued that the incriminating statements should not have been suppressed because the officers had legitimate reasons for eavesdropping, i.e., they were investigating other crimes. The *Moulton* opinion rejects the argument. Striking a balance between the officers' right to investigate other crimes and the seeking of evidence to support pending charges, the court allows such investigation but excludes the evidence if the officers were knowingly circumventing the defendant's right to counsel. Specifically, the court said: "[I]ncriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." (*Maine v. Moulton, supra,* 474 U.S. 159, 180 [106 S.Ct. 477, 489], fn. omitted.) In context, the court was discussing the argument that the police action was justified because the police were investigating another crime. At the end of the opinion, the court states: "Because we hold that the Maine police knowingly circumvented Moulton's right to have counsel present at a confrontation between Moulton and a police agent, the fact that the police had additional reasons for recording Moulton's meeting with [his codefendant] is irrelevant." (*Ibid.*)

However, an argument based on *Moulton* was rejected in *Cobb* because " 'to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained,

simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.'" (*Texas v. Cobb, supra*, 532 U.S. 162, 170-171 [121 S.Ct. 1335, 1342], quoting *Maine v. Moulton, supra*, 474 U.S. 159, 179-180 [106 S.Ct. 477, 488-489].)

The fact that the officers were investigating a new crime, witness intimidation, means that the Sixth Amendment right to counsel had not attached to that investigation, even if it was closely related to the murder investigation. Since the police were entitled to pursue the new investigation, we must uphold the trial court's decision under the principles discussed above unless we find that the officers knowingly circumvented defendant's right to counsel. To show knowing circumvention defendant would have to show an agreement between Ms. Camolinga and the officers to obtain evidence against defendant with regard to the charged crime. (*People v. Frye, supra*, 18 Cal.4th 894, 993.)

No such showing has been made here. We therefore cannot make a finding of knowing circumvention. Instead, we must defer to the trial court's factual determinations (*People v. Fairbank, supra*, 16 Cal.4th 1223, 1247-1248) that (1) Ms. Camolinga was not acting as an agent of the police; (2) there was no agreement to elicit statements from defendant regarding the charged offense (*In re Neely, supra*, 6 Cal.4th 901, 915); and (3) the officers did not create a situation likely to induce incriminating statements (*United States v. Henry, supra*, 447 U.S. 264, 270 [100 S.Ct. 2183, 2186-2187]). We therefore conclude that the officers did not knowingly circumvent defendant's Sixth Amendment rights. (*People v. Frye, supra*, 18 Cal.4th 894, 991-994.)

### DISPOSITION

The judgment is affirmed.

McKinster J., and Richli J., concurred.

A petition for a rehearing was denied June 11, 2002.