Filed 5/5/15  P. v. Thomas CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039990 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1102315) |
| v. | |
| MARK RENEE THOMAS, | |
| Defendant and Appellant. | |

Defendant Mark Renee Thomas appeals from a judgment of conviction entered after a jury found him guilty of five counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c).)  The jury also found that defendant personally used a handgun during the commission of each robbery.  (Pen. Code, § 12022.53, subd. (b).)  In a bifurcated trial, the court found true the allegations that defendant had three prior strike convictions (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), one prior serious felony conviction (Pen. Code, § 667, subd. (a)), and one prior prison term (Pen. Code, § 667.5, subd. (b)).  The trial court sentenced defendant to an indeterminate term of 125 years to life, which was consecutive to a determinate term of 75 years.  On appeal, defendant contends that his trial counsel rendered ineffective assistance by failing to file an in limine motion to

exclude the testimony of a wireless phone expert on *Kelly*[1] grounds and by failing to call his own expert witness. We conclude that defendant was not deprived of the effective assistance of counsel and affirm the judgment.[2]

## I. Statement of Facts

## A. Prosecution Case

At about 9:00 p.m. on March 23, 2009, Nelson Martinez, Omar Nava Carrillo, Raul Martinez, Marisela Maria Mercado Vargas, and Maria Del Pilar Garduno were working at a Burger King restaurant in San Jose when two armed men entered. One of them pushed Carrillo towards the office and demanded money from the safe. Carrillo gave him $7,930. According to Carrillo, this robber was wearing black pants, a blue sweatshirt, and gloves. Though Carrillo could not see the robbers' faces, he described their skin as "dark." Neither robber was wearing a hat.

The other robber grabbed Raul's[3] back, led him to the cash register, and told him to open it. According to Raul, the robber's face was covered, and he was wearing gloves and a black jacket. When Raul was unable to open the cash register, the robber demanded Raul's wallet. Raul gave him his wallet, which contained $400. The robber then told Raul to go to the back of the restaurant. Garduno saw the armed robber behind Raul, but could not see his face. The robber ordered Garduno, Nelson, and Vargas to go to the back of the restaurant. According to Nelson, the robbers were wearing long, black rain coats and dark blue or black pants. He could not tell what race they were, but they

---

[1]     *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-848.

[2]     Defendant has also filed a petition for writ of habeas corpus. We have ordered the petition for writ of habeas corpus to be considered with his appeal. We dispose of the petition for writ of habeas corpus by separate order.

[3]     We refer to Raul Martinez and Nelson Martinez by their first names to avoid confusion.

2

were taller than he was, and big and "more robust." Vargas did not know the race of the robbers.[4] They were both wearing a black, hooded sweatshirt or jacket, and gloves.

Brandon Doe and Jesus Cuevas were in their car at the drive-thru window of the Burger King when the robbery occurred. After Garduno gave Brandon part of his order, he saw a masked man pointing a gun at her. The robber then pushed Garduno to the next room and ripped the phone off the wall. Brandon called 911. While talking to the 911 operator, Brandon saw the two robbers exit the restaurant. As Brandon followed them in his van, the robbers ran to a Pontiac Grand Prix which was parked in a red zone. After the robbers jumped into the car, it took off. Brandon followed the car onto the northbound freeway.

As Brandon was following the car, he gave dispatch the license plate number. The car eventually exited the freeway and stopped abruptly on the shoulder of the off-ramp. Brandon went around the car and stopped in front of it. Two doors opened, and two people exited the car and ran through the ivy patch. After the car continued down the off-ramp and entered a gas station, Brandon followed. Ellamae Daigle exited the car and asked Brandon why he was following her. He replied, "You know why I'm following you. The police are on their way." The police arrived a minute later. They searched the ivy patch, but they were unable to locate the robbers.

According to Brandon, the robbers were African American and similarly dressed, though one wore a hood while the other wore a beanie. Cuevas described them as African American men who were wearing dark clothing with a hooded top.

When Lieutenant Keith Miller responded to the scene, he observed Daigle talking on her cell phone outside her car. He arrested Daigle. Lieutenant Jason Ta searched Daigle's cell phone and found defendant's phone number. He also searched the car and found a black beanie cap in the front passenger seat.

---

[4]     On the night of the robbery, Nelson told Officer Donald Guerra that the robbers were African American men.

3

Cathleen Trowbridge, a criminalist, testified as an expert in the area of forensic analysis of DNA and identification of persons. The results of a DNA test of the beanie showed that defendant was a potential contributor. According to Trowbridge, "[t]he probability that somebody who didn't leave any DNA on that hat, still being considered a potential contributor [was] . . . one in 300 billion in the African American population, one in 1.2 trillion in the Caucasian population, and one in 5.6 trillion in the Hispanic population."

On August 5, 2009, Lieutenant Miller went to Gesiele Thomas's apartment to look for defendant. Thomas was defendant's cousin and lived near the Burger King that was robbed. Lieutenant Miller told Thomas that he had a warrant for defendant's arrest and asked if she knew about it. She responded that "family talk was that he had got in trouble . . . with that girl." Lieutenant Miller asked if he could search her residence. She consented to the search, but defendant was not there. He also asked her whether she had received a phone call from defendant. She eventually said that defendant called her that night when he "got in trouble . . . ." Thomas told him that she received a call from defendant around 11:00 p.m. and "he had told her he had been in trouble with the girl and wanted someplace to go. And she told him, that he was not welcome at her apartment." Defendant also told her that "he was going to have to go on the run and not to call him on his cell phone." Thomas also stated that she had not seen defendant since March.

Lieutenant Miller reviewed defendant's phone records. Defendant called Thomas at 12:49 a.m. on March 24, 2009, for one minute and 39 seconds. There were also more than 10 calls from defendant to his sister Mary Magee on the evening of the robbery.

At trial, Thomas did not remember the details of the interview with Lieutenant Miller or phone calls from either defendant or his sister on March 23, 2009. Magee could not remember at trial whether she had received phone calls from defendant on the night of the robbery.

4

While defendant was in jail awaiting trial, he called Magee.[5]  During the May 26, 2011 phone call, he asked Magee to contact Thomas and ask her to tell the police that he was at Thomas's house on the night of the robbery.  In a conversation in December 2011, defendant and Magee referred to the preliminary hearing and Thomas's potential testimony.  Magee understood that when defendant referred to the girl, he was referring to Daigle.

Jim Cook testified as an expert in the area of cellular technology and cell phone records analysis.  After reviewing the subscriber information related to the cell phones of defendant and Daigle, he testified regarding their location based on the connection between their cell phones and the closest cell tower sites when the calls were initiated on the night of the robbery.  Defendant's cell phone records showed that he was in the area of his residence and Daigle's residence in Palo Alto from 12:45 p.m. through 8:03 p.m.  Defendant arrived in the area of the crime scene at 8:45 p.m.  Defendant was in the area of the crime scene from 8:45 p.m. through 12: 54 a.m. and he placed and received 26 calls.  There were four calls to and from Daigle, 10 calls to and from Magee, and two calls to and from Thomas.  Daigle's cell phone records showed that she began traveling from Palo Alto toward the area of the crime scene at 8:11 p.m.  Daigle made cell phone calls in the area of the crime scene, the getaway route, and the arrest site between 8:44 p.m. to 11:04 p.m.  Defendant's cell phone records showed defendant called Magee six times between 11:57 p.m. and 12:46 a.m. on the night of the robbery.  At 11:58 p.m., Magee's cell phone connected to a cell tower site near her residence.  After Magee received a call from defendant at 12:36 a.m., she traveled from her residence to the area of the crime scene.  While in the area of the crime scene, she received five more calls from defendant.  At 1:23 a.m., Magee traveled toward defendant's residence as she placed a call to him.

---

[5]     Three of the taped conversations between defendant and Magee were played for the jury.

On cross-examination, Cook conceded that his analysis did not reveal the identity of the person holding the cell phone when the call was made. Cook also acknowledged that he was unable to determine whether a cell tower site was not functioning in 2012. Thus, the cell phone records would not disclose whether a particular cell phone connected to the next closest cell tower site, thereby inaccurately indicating the location of the cell phone.

The parties stipulated that the prosecution called Daigle as a witness in this case. She refused to testify and was held in contempt outside the presence of the jury.

### B. Defense Case

Officer Brian Egan investigated a robbery, which occurred on February 10, 2009, at an art supply store in Mountain View. During the investigation, he discovered that a car, which was associated with this robbery, was registered to Rekeshia Duffy, Daigle's daughter. At the time of trial in the present case, the art store robbery remained unsolved. Lieutenant Jeffrey Sato also participated in the art store robbery investigation. During a search of Duffy's vehicle, he "found the front sight of a Glock handgun." The vehicle was released to Daigle on March 6, 2009.

### II. Discussion

Defendant contends that his trial counsel rendered ineffective assistance when he failed to file a motion in limine to exclude Cook's testimony on *Kelly* grounds. He also contends that trial counsel's performance was deficient, because he failed to: (1) challenge Cook's qualifications; (2) request that the prosecutor provide a proffer of the testimony; (3) move to strike at the conclusion of direct testimony; and (4) call his own expert.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the

6

assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) That right "entitles the defendant not to some bare assistance but rather to *effective* assistance." (*Ibid.*) But the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8.)

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.)

Pursuant to the *Kelly* rule, "the proponent of evidence derived from a new scientific methodology must satisfy *three* prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that '"correct scientific procedures were used in the particular case."'" (*People v. Roybal* (1998) 19 Cal.4th 481, 505.)

When trial counsel reasonably determines that filing a motion would be futile, his failure to do so does not constitute deficient performance. (*People v. Price* (1991) 1 Cal.4th 324, 387, superseded by statute on other grounds in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.) Here, as the Attorney General points out, the cell tower tracking technique had been widely accepted and admitted into evidence in courts throughout the nation at the time of defendant's trial in January 2013. (See, e.g., *People v. Martin* (2002) 98 Cal.App.4th 408, 412 [prosecutor "relied on [the defendant's] cell phone records to establish his location during the crucial time period"]; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1016-1017 [prosecutor relied on cell phone records to

7

establish the locations of defendant's accomplices]; *United States v. Dhinsa* (2d Cir. 2001) 243 F.3d 635, 661 [cell phone records confirmed the defendant's presence in the area where the victim was murdered]; *Pullin v. State* (Ga. 2000) 534 S.E.2d 69, 71 [Georgia Supreme Court concluded that evidence supported the finding that "sound scientific theory" supported the use of cell phone records to establish the location of calls]; *State v. Tran* (Minn. 2006) 712 N.W.2d 540, 543-545 [cell phone records showed that the defendant was in the victim's neighborhood when the murder occurred]; *Wilson v. State* (Tex.Ct.App. 2006) 195 S.W.3d 193, 196-197 [cell phone records showed the defendant "traveling from the vicinity of his residence to the victim's residence during the time period in question"]; and *Pantazes v. State* (Md.Ct.App. 2001) 785 A.2d 865, 872 [cell phone records suggested that call from victim's phone to the defendant's phone not made from the victim's home].) Since a reasonably competent attorney would have concluded that a challenge to the cell tower tracking evidence on *Kelly* grounds was futile, defendant has failed to show that trial counsel's performance was deficient.[6]

Even assuming that defendant has shown that trial counsel's performance was deficient because he failed to challenge Cook's testimony and to call his own expert witness, he has failed to show prejudice. The evidence against defendant was very strong. Three eyewitnesses identified the robbers as African American men. One of the eyewitnesses testified that one of the robbers wore a beanie, and defendant's DNA was found on a beanie in the getaway car. Defendant had extensive phone contact with the driver of the getaway car and his sister on the night of the robbery. He also spoke with his sister from jail and attempted to fabricate an alibi. Moreover, defendant told his cousin on the night of the robbery that he was on the run and was in "trouble with that

---

[6] Defendant also claims ineffective assistance of counsel based on trial counsel's failure to: (1) challenge Cook's qualifications on the subject; (2) move to strike Cook's testimony; (3) cross-examine Cook on the limits of single-tower methodology; and (4) call a defense expert. As previously stated, since cell tower tracking technique had been widely accepted at the time of defendant's trial, we reject these claims.

8

girl." Thus, it is not reasonably probable that appellant would have received a more favorable outcome if trial counsel had successfully objected to the cell tower tracking evidence or called his own expert witness.

### III. Disposition

The judgment is affirmed.

_____

Mihara, J.

WE CONCUR:


_____

Bamattre-Manoukian, Acting P. J.



_____

Grover, J.