Filed 11/19/13  P. v. Lankford CA4/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DESMEN LANKFORD,<br><br>    Defendant and Appellant. | A133944<br><br>(Alameda County<br>Super. Ct. No. C163147) |

A jury convicted appellant Desmen Lankford of two counts of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true the allegations that he personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (d)) and personally inflicted great bodily injury (§ 1203.075) when he committed the murders.  He was also convicted of being a felon in possession of a firearm (§ 12021, subd. (a)(1)), and ammunition (§ 12316, subd. (b)(1)).  Sentenced to life in prison without the possibility of parole, Lankford appeals.  He contends reversal is required because the trial court erred by admitting his

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

1

statements to a jailhouse informant because they were obtained in violation of his right to counsel. Lankford further contends that various evidentiary errors require reversal. We affirm.

## I. FACTS

### A. The Murders

Around midnight on September 18, 2008, Christopher Morris was walking his two dogs on Sacramento Street in South Berkeley. As he approached Carleton Street, Morris noticed an individual walking between Carleton and Derby Streets on Sacramento and another individual coming around the corner on Carleton onto Sacramento. The two men were walking in the southbound direction on the other side of the street from Morris. The individual walking in front was a Black male, between five-eight and six feet tall, wearing a brown sweatshirt. The other individual was a half-block behind the first and was shorter and skinnier.[2] He wore a black sweatshirt with a picture of a skeleton on it. This man was in the process of putting his hood up on his head and Morris thought he was a Black male as well. Morris did not notice anything distinctive about the second man's hair.

The two men walked at a good pace, which Morris described as neither hurried nor relaxed. Morris saw the man with the skeleton sweatshirt stop and reach for something around his ankle. Both men turned right onto Derby Street. Morris continued walking his dogs towards the intersection of Sacramento and Derby Streets and the two men disappeared from his view down Derby Street. As he approached Derby Street, Morris heard two gunshots, followed quickly by a second set of gunshots. It came from the same vicinity where the two men had gone. Following the second round of shots, Morris saw a red four-door sedan, with the driver as the lone occupant, drive through the intersection of Derby and Sacramento and crash into a parked car. The car came from the

---

[2] The second man was "definitely shorter" than Morris, who was six feet tall. He estimated the second man was between five feet two inches and five feet four inches tall, but he could not be certain. Morris agreed that the second man could have "easily" been a "couple of inches taller."

2

same direction where the two men had gone.  Morris took cover behind a car and called 911.

## B.    The Investigation

### 1.    Evidence at the Scene

Officer Robyn Fuentes of the Berkeley Police Department responded to the scene. When she arrived, she saw what appeared to be a vehicle collision between a red Chrysler and a green Honda.  There was severe front end damage to the Chrysler and considerable damage to the rear end of the Honda.  The Honda was unoccupied and appeared to be parked.

Officer Fuentes approached the Chrysler and observed the lone occupant in the driver's seat.  The car was smoking and still idling and inching forward.  The driver, later identified as Kelvin Davis, aka "Twin," suffered severe head wounds from gunshots to the head.  Davis had a faint pulse, but later died from the multiple gunshot wounds.

Meanwhile, Berkeley Police Officer Lionell Dozier arrived at the scene, where he saw a body lying in the street.  The body was later identified as Kevin Parker, aka "KK." Parker was unresponsive and with multiple gunshot wounds to the head, which were later deemed to be the cause of death.  Numerous shell casings were found around Parker's body.  There were 12 .40 caliber casings and two .357 caliber shell casings.  There was also a live .357 round at the scene, as well as bullet fragments.  One .357 shell casing was found on the right rear passenger door of the Chrysler.

Detective David Marble of the Berkeley Police Department also had been dispatched to the scene.  As the designated lead detective, Detective Marble was responsible for writing the majority of the police report and testifying in court.  He found bullet fragments underneath Parker's head.

### 2.    Ralph White aka "Bony Ralph" Arrested in Unrelated Matter

On the evening of September 25, 2008, Detective Marble received a call from Detective Chu of the Berkeley Police Department Narcotics Unit.  Detective Chu had arrested an individual named Ralph White aka "Bony Ralph" in connection with a narcotics violation.  Detective Chu told Detective Marble that White wanted to speak

3

with someone from the Homicide Division regarding the murders of Davis and Parker. Detective Marble interviewed White at the Berkeley Police Department the following day.[3]

White told Detective Marble that appellant was responsible for the homicides. White came across appellant quite often in the course of his (White's) work as a cocaine dealer, selling both crack and powder. Appellant was one of White's customers; the two would frequently stop and talk to each other. Appellant came over to White's residence a couple of times a week to socialize, smoke marijuana, and buy cocaine. Appellant went by the nickname of "Spice" and was associated with the North Oakland street gang, a rival of the South Berkeley gang.

White knew victim Kelvin Davis. Kelvin Davis was known as "Twin" because he had a twin brother named Melvin. White also knew of victim Kevin Parker, but did not know his real name. White only knew him as "KK." Both Kelvin and Melvin Davis were associated with the rival South Berkeley gang.

The day after the murders of Davis and Parker, appellant came over to White's apartment. Appellant was acting normally and they smoked marijuana together. Appellant asked White if he knew anyone who wanted to buy a .357 gun. Shortly thereafter, appellant asked White if he had heard about the murders of Davis and Parker. Appellant said he saw Davis at a gas station on 6th and Ashby. Davis was sitting inside a car with another individual. Appellant was also with someone in his car. Appellant watched the two men for a while and saw Davis switch seats and get into the driver's seat. Appellant followed the men in his car to Derby and Sacramento. When Davis stopped the car, appellant drove past and parked around the corner. From his position, appellant could see Davis and Parker smoking a blunt.[4] After watching Davis and Parker smoke the blunt for a while, appellant got out of his car and snuck up on the two men.

---

[3]     Although Detective Marble videotaped the interview, due to a recording malfunction the interview was not preserved on tape.

[4]     White explained that a blunt is created by removing the tobacco from a cigar and replacing it with marijuana.

4

Appellant admitted killing Davis and Parker. Appellant told White that he went up on the driver's side and shot the two men in the car. According to appellant, Davis hit the gas pedal after he was shot and tried to drive off. Parker managed to get out of the car and attempted to run off. Appellant told the person he was with to go and shoot Parker because he could identify them. Appellant's partner shot Parker. Appellant and his cohort ran off after shooting the victims.

Appellant told White that the intended target actually was Melvin Davis, but since he could not find Melvin, killing his twin brother Kelvin was good enough. White said appellant never identified his partner in crime, but White added that in the month before the homicides, appellant only hung around with Wilkins Owens aka "Wick-Wack." In an attempt to corroborate White's statement, the police searched the red Chrysler and found two blunts from the car.

*3.    Appellant's Arrest and Related Residential Search*

In October 2008, Officer Larry Robertson of the Oakland Police Department Targeted Enforcement Task Force (TETF) received information that appellant might be staying at 1718 13th Street and that he went by the alias of Jason Johnson. At that time, Officer Robertson, who worked in surveillance, was a plain clothes officer with long hair and a beard, and he drove an unmarked car.

On October 9, 2008, Officer Robertson, along with other members of the TETF, surveilled the area around 1718 13th Street. For approximately two hours, Officer Robertson, who was alone in his unmarked car, was parked directly across the street from the residence. From this vantage point, he was able to see an individual, believed to be appellant, coming in and out of the residence on several occasions. He could not tell if appellant used a key to gain access, but could see that appellant did not knock on the door. Around 8:00 p.m., Officer Robertson saw a green Chrysler arrive; appellant left the residence, got behind the wheel of the Chrysler and drove off. Officer Robertson radioed the arrest team and advised them to stop the car. While appellant was detained at the traffic stop, Officer Robertson and other team members entered 1718 13th Street and conducted a search.

5

During that search, officers recovered a black hoodie with a white skeleton design from a bedroom believed to be appellant's room. They also found a loaded Sig Sauer .357 magnum semi-automatic pistol in the closet of appellant's bedroom, along with ammunition for a .357 caliber weapon and a .45 caliber weapon. A pink, digital camera was recovered from appellant's bedroom; the camera contained several photographic images of appellant, holding guns in his hands. Drug paraphernalia, including cutting agents, a funnel, plastic baggies, a scale, and toy balloons used to package narcotics were also found in the house.

4.      *Forensic Evidence*

The .357 Sig Sauer retrieved from the closet in appellant's bedroom was tested and found to be in proper functioning condition. The .357 casings found at the scene of the murders all were fired from the same weapon, the .357 Sig Sauer found in appellant's residence. Moreover, bullet fragments found at the scene had the same class characteristics as the Sig Sauer, in terms of number of grooves, number of lands, and the direction of the twists, but there was not enough detail to make a definitive identification. They could not have been from a .40 caliber weapon. All of the .40 caliber casings and bullet fragments were fired from one firearm.

The skeleton hooded sweatshirt observed by witness Morris and found in appellant's residence was also analyzed. Possible gunshot residue was found on the right and left sleeves of the sweatshirt, suggesting that the sweatshirt was in close proximity to a gun as it was discharged or it came into contact with a surface contaminated with gunshot residue. It could not be determined how long the residue had been on the sweatshirt.

## C.     *Gordon Gray: Jailhouse Informant*

On June 23, 2010, Gordon Gray was placed in North County Jail in connection with a felony assault with a deadly weapon count. Upon arriving at North County, Gray was assigned to appellant's cell. About a month or so after appellant and Gray became cellmates, appellant began telling Gray about the charged murders, as well as his involvement in the murder of Ronnie Easley. Appellant told Gray that he and his "

6

'coz','" Will Owens aka "Wick Wack," killed two men because of a feud with a rival gang. Appellant said he used a .357 Sig Sauer, while Owens used a .40 caliber. Appellant told Gray that the police had the .357 Sig Sauer and also had his girlfriend's camera with photos of the gun he used. Appellant said he was " 'scared about those photos.' "

Appellant revealed that he had told an individual named Bony Ralph about the murders and that Bony Ralph turned around and testified against him at his preliminary hearing. Appellant told Gray he had been sending coded letters to a friend about getting rid of Bony Ralph, but he did not think his friend understood what needed to be done. Appellant talked to Gray about when Gray would be released and asked Gray to deliver "letters" and "paperwork" to appellant's brother, Chris P. aka "Blast Holiday" that would boldly explain that Bony Ralph needed to be killed. Sometime between September 22, 2010, and October 6, 2010, appellant asked Gray if he would kill Bony Ralph when Gray got out of jail. The plan was for Gray to deliver the "paperwork" to Chris P. and that Gray, Chris P., and Wick Wack would "hook up" and set out to kill Bony Ralph.

### 1.    *Gray's Meeting with the District Attorney*

On October 14, 2010, after advising his attorney that he wanted to talk to someone at the district attorney's office, Gray met with Deputy District Attorney James Meehan and District Attorney Investigator Philip Dito at North County Jail.[5] At the meeting, Gray discussed how appellant admitted to committing the charged murders. Appellant also admitted that he killed an individual named Ronnie Easley and that he " 'did 10 months on it.' "

Gray revealed that appellant had asked him to deliver some "paperwork" upon his release from custody. Gray also said that appellant asked him for help in killing Bony Ralph. Gray agreed to speak with Berkeley homicide investigators regarding the statements made to him by appellant. No specific promises were made to Gray during

---

[5]    The interview was not recorded, but notes of the meeting were taken.

this interview, but he was advised that he might be able to resolve his case with a nonprison term in exchange for his cooperation as a witness.

2. *Gray's First Meeting with Detective Marble*

On November 9, 2010, Gray met with Detective Marble at North County Jail.[6] In that interview, Gray repeated how appellant described the circumstances of the charged murders, as well as his involvement in the murder of Ronald Easley. According to Gray, appellant liked to brag about his criminality, discussing how he killed Easley, as well as saying that he had knowledge about another murder that happened about two weeks ago. According to Gray, appellant said that Gary Ferguson was killed as part of the "Berkeley North Oakland feud." Apparently, one of appellant's friends, "White Boy," was shot and another person was killed. Appellant told Gray that a "dude" named "Colione" killed Ferguson in retaliation.

Detective Marble told Gray that he was the lead detective in the Ferguson case and that the information Gray provided about that case was "very important" but ultimately not usable because it was hearsay. However, as to the Easley murder, Detective Marble explained that he could use that information because, even though the charges had been dropped, it was "technically still open." Detective Marble asked Gray if appellant had mentioned any other murders, explaining that the jury would hear about this and other character evidence. Gray said that appellant talked about "trying to kill other people . . . [but] [h]e never really says anything about who he killed." When it appeared that Gray was annoyed about appellant not actually naming the other people, Detective Marble advised him: "Just be careful about, you know, questioning him . . . ."

Gray told Detective Marble about appellant's efforts to solicit his assistance in killing Bony Ralph and in delivering certain "paperwork" upon Gray's release from custody. During the interview, Detective Marble made no promises to Gray and neither directed Gray to question appellant about his case nor asked Gray to encourage appellant

---

[6] Although this interview was recorded, it appears that only a transcript of the interview and not the actual recording was presented in the trial court. As in the trial court, only the transcript of the interview is provided in the record on appeal.

to write letters for Gray to deliver. Gray told Detective Marble that he intended to give the letter to the police, but he did not want to actually deliver it because he did not want to be involved in the conspiracy. When Detective Marble asked Gray what he would do if the police asked him to follow through and deliver the letter, Gray said, "Then I would deliver . . . I would do that." Detective Marble replied, "Well that would be something that we would really have to consider. Now you didn't want to do it. That's one thing. We can't force you to do it." Gray added, "I don't want to do it but see he trusts me . . . I just didn't know if it was a good thing for you guys to think that I should deliver that letter." Detective Marble responded with the following: "I just automatically assumed that we would get the letter. We would Xerox [it] and then . . . have it delivered but you brought up a good point and it is your safety . . . . You know, if you were to deliver that letter and something were to happen to you that could be a problem. So I'll talk to the district attorney about that." Gray offered that the police could follow him to "a neutral safe spot" where it would be less likely that appellant's associates would try to do anything.

### 3. *Gray's Second Meeting with Detective Marble*

On December 15, 2010, Gray again met with Detective Marble. In this second interview, Gray reiterated that appellant openly discussed the murders of Davis and Parker. Gray said he was supposed to take "some paperwork" to appellant's brother, Chris P., regarding the planned murder of Bony Ralph. Gray told Detective Marble that he told appellant he would meet up with Chris P. and Wick Wack and that they would kill Bony Ralph. Gray explained appellant asked him about it many times and that he assured appellant he would make it happen. However, Gray never had any intention of joining in this plan. Rather, his real plan was to let the police know about appellant's plot to kill Bony Ralph.

## D. Trial

### 1. *Appellant's Pre-Arrest Confession*

White testified at trial pursuant to a plea bargain, under which his pending cases were dismissed. White identified a photograph of appellant from 2008, depicting him

9

with long dread locks to the shoulder.  Consistent with what he told Detective Marble, White testified that appellant admitted to killing Parker and Davis.

 2. *Evidence of Appellant's Jailhouse Confession*

Detective Marble testified that upon Gray's release from custody, he handed over letters that appellant had given him to deliver to his friends.  In one letter addressed to "Cash Flow," dated December 19, 2010, appellant said he hoped that Cash Flow could understand his hidden message, "I gotta put that to keep them off my hidden message.  So I be hope'n you read between the lines.  I could really give a fuck about a lawyer right now.  My question is why this nigga still walk'n around breath'n, (Bony Ralph)?"  Appellant also wanted to know about what was being done about the attack on "WhiteBoi," also known as Anthony Thomson.  The letter is signed by "Cold Gunnaz Finest," "Spice City."  Detective Marble testified that "Cold Gunnaz" is the name of appellant's gang, and appellant has these words tattooed on his forearms.[7]  Detective Marble also testified that "Spice City" was a nickname for appellant.  Also included in the envelope to "Cash Flow" was a six-page summary of White's statement to the police and transcript of an interview with White.

In another letter to "Kleet Da Muthafuckin Banga," aka Jason Johnson, appellant's cousin, appellant said to him, "At trial I'ma need you to put it on alot thicker then you did at prelim bout the house (west) and room and shit.  I know that shit scary to get up on that stand, but this time around you gotta get up there wit confidence and swagg like you ain't got a care in the world cuz it's gone be in front of the jury!  Don't trip I'ma write down all the questions and answers fa you that my lawyer gone ask you and all you gotta do is read and go over it and spit it on the stand best you can.  My lawyer gone have a copy of the same questions and answers you got so everythang gone be on point.  All you gotta do is stick to the script.  I told my mom to ask you was you gone claim the gun in the room?  I know that seem like sum scary shit to do but in all actuality it's not.  They can't charge you wit the gun cuz the gun case is over a year old, . . . they can't charge you wit

---

[7]  The jury was shown a photograph of the tattoos on appellant's forearms.

10

the murders on the gun cuz they don't have no body to say you had sumthin to do wit the murders so that's a dead issue. If they ask you who gun was in the room, you say mine then you gonna go into a story about how you bought the gun off the streets from somebody who dead now. Blah, blah, blah." Appellant next said that it was Bony Ralph who informed on him to the police. Appellant urged his cousin and all his friends to find Ralph and to get some handguns. Appellant also said that he was "sick" about "WhiteBoi" being dead. He then ordered his cousin to tear up the letter after reading it.

> 3. *Appellant's Recorded Telephone Calls From Jail*

The prosecution introduced evidence of telephone calls appellant made from jail to his friends that were intercepted by the police. In these conversations, appellant expressed his concerns about the police finding photographs of him holding handguns. He also worried about his fingerprints being found on the handgun. He said he had let his guard down and hoped he would not have to fight a homicide charge. In another conversation, appellant spoke to an individual at the 13th Street apartment—the residence that had been searched by the police. In response to appellant's question, "Is the house fucked up?" a female responded, "Yes, it is. I'm cleaning up your room right now." Appellant told the female, "Go sleep in my room." During this call, appellant also spoke with an unidentified man and expressed his concern about the photographs on the camera. Appellant also told the man that the police "took my baby mamma keys . . . and went to go see if any key fit the door . . . ." The man said that he did not see a marked police car outside on the day of the search. Appellant responded, "Nope I didn't see one. But I don't live there though, blood. That ain't my house nigga . . . You feel me?" The man agrees and says, "They ain't got nothing." Appellant reiterates, "[t]hat ain't my house that ain't my parole address, I don't live there. You all didn't see me coming out of there."

In a third telephone conversation with Wilkins "Wick Wack" Owens, appellant discussed how to dispose of the .40 caliber handgun. They also talked about the .357 Sig Sauer handgun. In a later conversation with Anthony Thompson, Thompson informs appellant that Wilkins has been going around talking and telling everyone about what

11

happened.  Appellant tells Thompson, "Make sure you niggas put a lid on my cousin, man fast.  Check that nigga on everything."

### 4.    *Jailhouse Graffiti About Gray Found in Appellant's Cells*

Graffiti was found on the walls of three cells where appellant had been housed.  It said, "Gordo Gray is a snitch.  He's from the Dubbs.  He's rappin and shit."  The graffiti was signed by "Spice."  White testified that while he was in custody pending the drug charges in August 2011, he was placed in a single cell for "keep-separate" inmates, where he noticed the graffiti about Gray on a cell wall.  To White, the graffiti was a message alerting others that Gray was a snitch and that someone wanted to hurt Gray.  Deputy Dennis Armstrong of the Alameda County Sheriff's Department explained that the graffiti served as a message board to other inmates to notify them to be aware of a particular individual.

### 5.    *Gray Disappears Before Testifying*

Just before the start of appellant's trial, the district attorney and his investigator met with Gray.  Gray was cooperative and was served with a subpoena to appear as a witness.  On the day of his expected testimony, Gray was escorted to the witness waiting room.  Gray, however, left at the lunch break and did not reappear.  Gray failed to appear at trial and a bench warrant was issued.

Repeated efforts to locate Gray were unsuccessful.  Gray's attorney testified that Gray had talked to the district attorney's office and worked out a deal where he would testify against appellant.  In exchange, Gray would receive probation instead of a state prison sentence if he agreed to testify truthfully at appellant's trial.  He pleaded guilty to assault with a semiautomatic firearm and being a felon in possession of a firearm.  Gray's attorney explained that he had been unable to track down Gray and he had not heard from him.

### 6.    *The 13th Street Apartment*

Appellant's cousin, Jason Johnson, testified that in 2008, he and his brother Glen lived in the lower unit of a house located at 1718 13th Street in Oakland.  They each had their own room and a third bedroom was unoccupied but sometimes other people stayed

there. Appellant spent several days a week at the 13th Street apartment. Johnson called it a "little kick-it spot," to play video games and hang out with women. However, Johnson and his brother Glen were the only ones with keys; Johnson assumed that Glen let appellant into the apartment.

In September 2008, Johnson spent a lot of his time in Pittsburg with his pregnant girlfriend. The only mail Johnson received at the 13th Street apartment was from his brother Jarrell Johnson, who was serving time in state prison. Johnson realized appellant had been using his name as an alias. Johnson testified that appellant used his name without his permission. Johnson did not keep any weapons or ammunition in the residence because the terms of his probation prevented him from keeping any weapons. After he found out that the police had conducted a search of his house in October 2008, Johnson went to the house to check on its condition. All his personal belongings were still there. He testified that the gun and the camera found inside the house did not belong to him.

Johnson also identified a photograph of appellant wearing the hoodie with the skeleton bones. Johnson used to own a similar sweatshirt that he kept at the apartment, but he never saw appellant wear it. Johnson explained that there is nothing unique about the skeletal hoodies, noting that he has seen other people wearing the same sweatshirts.

7. *Defense Witnesses*

Appellant's parole officer met with him in 2008 at an address on Alcatraz Street. The parole officer had no knowledge of appellant having any connection to 1718 13th Street.

Jarrell Johnson, appellant's cousin and brother of Jason Johnson and Glen Clark, was serving time in Solano State Prison. During the six years that he had been in prison, he had never written to appellant. He, however, frequently sent letters to his brother Jason at the 13th Street apartment.

13

## II. MASSIAH

### A. *Trial Court Ruling*

Appellant contends the trial court erred by admitting the letters Gray gave to the police that contained his jailhouse statements. He argues that the statements he made to Gray were obtained in violation of his Sixth Amendment right to counsel. (See *Massiah v. United States* (1964) 377 U.S. 201, 205-207 (*Massiah*).) He reasons that Gray acted as a government agent deliberately eliciting incriminating statements from him. Appellant asserts that this violation of *Massiah* was prejudicial.

In the trial court, appellant moved to exclude Gray's testimony as taken in violation of *Massiah,* alleging that Gray was a government agent who deliberately elicited incriminating statements from him. After hearing, the trial court ruled that Gray was not a government agent because the police did not create a situation likely to provide it with incriminating information from appellant. The court noted that the police did not find out about Gray until he volunteered information to them. It deemed Gray to have acted on his own initiative rather than at the behest of the government. Thus, the trial court ruled that Gray's testimony about what appellant told him was admissible and it denied appellant's motion to exclude that testimony on *Massiah* grounds.

### B. *Applicable Law and Standard of Review*

Once an adversarial criminal proceeding has been initiated against an accused, the constitutional right to counsel attaches. From that time on, any incriminating statement that the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against that defendant. (*Massiah, supra,* 377 U.S. at pp. 205-207; *In re Neely* (1993) 6 Cal.4th 901, 915; *In re Wilson* (1992) 3 Cal.4th 945, 950, cert. den. *sub nom. California v. Wilson* (1993) 507 U.S. 1006; see *Maine v. Moulton* (1985) 474 U.S. 159, 170; see also U.S. Const., 6th & 14th Amends.) The government actor need not be a regular government employee. If an accused's cellmate acts as a government agent, an incriminating statement *deliberately elicited* from the accused by that jailhouse informant is likewise inadmissible. (*United States v. Henry* (1980) 447 U.S. 264, 269-274 (*Henry*);

14

see *Kuhlmann v. Wilson* (1986) 477 U.S. 436, 458; *Maine v. Moulton, supra,* 474 U.S. at pp. 173-174 [informant surreptitiously recorded accused's statements].)

To prove a Sixth Amendment *Massiah* violation in a case involving a jailhouse informant, the defendant must establish that both the government and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. (*Kuhlmann v. Wilson, supra,* 477 U.S. at p. 459; *In re Neely, supra,* 6 Cal.4th at p. 915; *In re Wilson, supra,* 3 Cal.4th at p. 350.) Specifically, the evidence must show that the informant (1) acted as a government agent or was under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage; and (2) deliberately elicited incriminating statements. (*Kuhlmann v. Wilson, supra,* 477 U.S. at p. 459; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1247, cert. den. *sub nom. Fairbank v. California* (1998) 525 U.S. 861 (*Fairbank*); *In re Neely, supra,* 6 Cal.4th at p. 915; see *People v. Frye* (1998) 18 Cal.4th 894, 993, cert. den. *sub nom. Frye v. California* (1999) 526 U.S. 1023, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The critical inquiry in informant cases is whether the government made a knowing exploitation of an opportunity to coax information from a formally charged suspect in the absence of counsel. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1240, cert. den. *sub nom. Gonzalez v. California* (1991) 502 U.S. 835, superseded by statute on other grounds in *In re Steele* (2004) 32 Cal.4th 682, 691.) If the informant acts on his or her own initiative to interrogate an accused, the government may not be said to have deliberately elicited a statement from the accused, even if the government had a general policy of encouraging inmates to listen and report. (*Fairbank, supra,* 16 Cal.4th at p. 1247; see *In re Neely, supra,* 6 Cal.4th at p. 915; *People v. Gonzalez, supra,* 51 Cal.3d at p. 1240; *People v. Williams* (1988) 44 Cal.3d 1127, 1141, cert. den. *sub nom. Williams v. California* (1988) 488 U.S. 975.) In other words, where " '[t]he police simply made use of [the informant's] own motivation to inform on defendant . . .' " (*People v. Martin* (2002) 98 Cal.App.4th 408, 418), courts have declined to find a " 'knowing subversion of the defendant's right to counsel . . . .' [Citation]." (*Ibid.*)

15

A preexisting arrangement between an informant and government agents need not be explicit or formal, but may be inferred from evidence that the parties behaved as if they had an agreement, based on a course of conduct occurring over a period of time. (*Fairbank, supra,* 16 Cal.4th at p. 1247; *In re Neely, supra,* 6 Cal.4th at p. 915.) Specific direction from government agents or a prior working relationship with such agents can establish an implicit agreement. (*Fairbank, supra,* 16 Cal.4th at p. 1247; see *Henry, supra,* 447 U.S. at pp. 270-273, & fn. 8 [by prearrangement, government paid informant if he produced useful information about accused whom government had singled out for inquiry]; *People v. Gonzalez, supra,* 51 Cal.3d at p. 1241.) An agency relationship may be established by evidence of government officials directing the informant to focus on a particular person or on a specific type of information sought by the government. (*In re Neely, supra,* 6 Cal.4th at p. 915; *People v. Martin, supra,* 98 Cal.App.4th at p. 420.)

The issue of whether the informant's testimony may be admitted into evidence is " 'an essentially factual question, and we review it on a deferential standard.' " (*Fairbank, supra,* 16 Cal.4th at pp. 1247-1248, quoting *People v. Memro* (1995) 11 Cal.4th 786, 828, cert. den. *sub nom. Memro v. California* (1996) 519 U.S. 834, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2; see *People v. Martin, supra,* 98 Cal.App.4th at p. 421.) Thus, when the trial court makes a permissible interpretation of the evidence before it and necessarily concludes that no agency relationship existed, the appellate court will defer to the trial court's finding in this regard. (*People v. Martin, supra,* 98 Cal.App.4th at pp. 420-421.)

## C.    *Analysis*

The *Massiah* principles, as applied here, make clear that Gray was not acting as a "[g]overnment agent expressly commissioned to secure evidence." (*Henry, supra,* 447 U.S. at p. 273.) To begin with, the government did not initiate contact with appellant. Gray's assignment to appellant's cell was purely a matter of happenstance and was not at the direction or prompting of the government. Further, once Gray became appellant's cellmate, the government did not instruct Gray to strike up conversations with appellant. Rather, at the outset, appellant clearly volunteered information about the facts of his case

16

and expressed his desire for Gray to deliver "letters" or "paperwork" on appellant's behalf once Gray was released from custody. Gray began collecting this information on his own initiative and decided to contact the authorities about it. There is no evidence that Gray had a previous history as an informant or had otherwise agreed to cooperate with the government in any other contexts.

By the time Gray first met with the District Attorney on October 14, 2010, he had been appellant's cellmate for several months and appellant had been taking steps to secure Gray's help with delivering "paperwork" with instructions to kill Bony Ralph. Gray, acting on his own behest, initiated contact with the government.

At that initial meeting, Gray discussed how appellant had admitted to committing charged murders, as well as his involvement in the Ronald Easley murder. Gray explained that appellant had asked him to deliver some "paperwork" upon Gray's release from custody. Appellant also asked Gray for his help in killing prosecution witness Ralph White. Gray agreed to speak with Berkeley homicide investigators concerning statements made to him by appellant. No specific promises or guarantees were made to Gray during that interview, but he was advised that he might be allowed to resolve his case to a non-prison term in exchange for his cooperation as a witness.

Thereafter, Detective Marble of the Berkeley Police Department conducted two interviews of Gray. In these interviews, Gray repeated how appellant described the circumstances of the charged murders, as well as his involvement in the Ronald Easley murder.

Specifically, in the first interview, Gray told Detective Marble about appellant's efforts to solicit his assistance in killing witness Ralph White and appellant's requests that Gray deliver paperwork that would not be subject to law enforcement screening, upon Gray's release from custody. Gray also told Detective Marble that appellant liked to brag about his criminality and that he boasted about having knowledge about the recent murder of Gary Ferguson. Detective Marble made no promises to Gray and neither directed Gray

17

to question appellant about his case,[8] nor asked Gray to encourage appellant to write letters for Gray to carry out of the jail.

In a subsequent interview, on December 15, 2010, Gray reiterated appellant's desire to have Gray smuggle letters out of the jail that included instructions about killing witness Ralph White. During this interview, Detective Marble again made no promises to Gray and neither directed Gray to question appellant about his case nor encouraged Gray to bring up the subject of letters for Gray to smuggle out of the jail when Gray was released.

On the record before us, there is no evidence that Gray deliberately elicited any information. Rather, the record shows appellant initiated the conversations with Gray, openly discussing the pending charges against him. Appellant's misguided decision to trust his cellmate does not implicate *Massiah*.

"[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." (*Kuhlmann v. Wilson, supra,* 477 U.S. at p. 459.) It is clear that appellant's incriminating statements and his decision to attempt to smuggle letters out of the jail through Gray were the result of appellant's voluntary conduct neither influenced nor coerced by Gray's acting as a "police agent." It is equally clear that appellant's incriminatory statements and decision to have Gray smuggle letters out of the jail were made well *before* Gray spoke with the authorities. These statements unquestionably preceded Gray's agreement to testify against appellant.

---

[8]     In his reply brief, appellant makes much of the isolated comment by Detective Marble, where he tells Gray to be "careful about . . . questioning" appellant. It does not appear that appellant raised this issue below and only raised it for the first time on appeal in his reply brief. In any event, this otherwise forfeited claim fails on the merits. Having read the entire transcript of Gray's first interview with Detective Marble, it is clear that this solitary remark pertains to appellant's propensity to brag about other crimes, including the Easley and Ferguson murders, and not the charged offenses regarding the murders of Davis and Parker.

Furthermore, the remark appears to have been a simple statement of caution in response to Gray's expression of annoyance with appellant rather than an instruction by Detective Marble for Gray to use care in constructing substantive questions.

18

The cases upon which appellant relies to establish his claim of *Massiah* error are clearly distinguishable. For example, in *In re Neely, supra*, 6 Cal.4th at page 917, the court found an agency relationship where a deputy sheriff told the informant that he "was seeking specific information from [the defendant] as to the whereabouts of the murder weapon," and the deputy "encouraged and instructed [the informant] as to the means by which [he] could procure this information from [the defendant]." Conversely, a review of Gray's interviews by Detective Marble on November 9, 2010 and December 15, 2010, demonstrate that Gray had no "agency relationship" with law enforcement nor was Gray ever encouraged to elicit incriminating statements from appellant. Detective Marble listened to Gray's account of appellant's plan to write letters not in "code" but in plain English to be carried out of the jail by Gray when released and hand delivered to appellant's associates. A review of those statements makes it clear that Detective Marble merely asked if Gray was prepared to hand over whatever letters were provided by appellant. Detective Marble neither encouraged Gray to suggest to appellant what kind of information he should include in the letters nor instructed Gray to actively solicit the letters.

"There is a distinct difference between passively receiving information provided by enterprising inmates and striking deals with inmates—whether based on coercion or enticement." (*United States v. York* (7th Cir. 1991) 933 F.2d 1343, 1357, overruled on other grounds in *Wilson v. Williams* (7th Cir.1999) 182 F.3d 562, 567.) It is obvious that Gray was not an agent when appellant made the fateful decision to trust his cellmate with the details of his crimes and plans to solicit the murder of prosecution witness Ralph White. "That inmates realize there is a market for information about crime does not make such inmate who enters the market a government agent." (*United States v. York*, *supra*, 933 F.2d at p. 1357.) Indeed, as the United States Supreme Court explained in *Maine v. Moulton, supra,* 474 U.S. 159, the Sixth Amendment "is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused," but by "knowing exploitation by the State of an opportunity to confront the

19

accused without counsel" or "the intentional creation of such an opportunity." (*Id.* at p. 176.)

Similarly inapposite is *Henry, supra,* 447 U.S. 264. In *Henry,* while the defendant was in jail, the government recruited and instructed Nichols, another inmate in the same cellblock, to keep his ears open for any incriminating statements from Henry, which he eventually heard and reported to the government. (*Id.* at p. 266.) The Court found that the government violated Henry's rights under *Massiah* by "intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel." (*Id.* at p. 274.) In so holding, the Court relied on three factors: (1) Nichols was acting under specific instructions related to Henry as a paid informant for the government; (2) Nichols "was ostensibly no more than a fellow inmate of Henry," (*id.* at p. 270), which caused Henry to trust him and thus be more likely to make incriminating statements, and (3) Henry was in custody and under indictment at the time Nichols spoke with him. (*Ibid.*)

Unlike *Henry,* here there was no evidence of a prior agreement with Gray either express or implied to obtain information from appellant about his case. Moreover, there is no evidence that Gray was purposely assigned to be appellant's cellmate. Rather, Gray's placement as appellant's cellmate was the result of fortuity and was not an intentional act designed to exploit an opportunity to confront appellant without counsel. (*Maine v. Moulton, supra,* 474 U.S. at p. 176.) Similarly fortuitous was appellant's decision to openly discuss the murders of Parker and Davis with Gray, as was his decision to enlist Gray to smuggle "paperwork" with instructions about killing Ralph White. It is clear that appellant's incriminating statements were not made as a result of any deliberate elicitation by Gray.

Equally distinguishable is *Randolph v. California* (9th Cir. 2004) 380 F.3d 1133 (*Randolph*). In *Randolph,* an informant came to the attention of county prosecutors "when he gave them a letter asking for leniency and mentioning that he was [the defendant's] cellmate." (*Id.* at p. 1139.) Immediately thereafter, the informant met with the deputy detective and district attorney "several times to discuss his possible testimony

20

against [the defendant], as well as a plea deal relating to the crime for which [he] was being held." (*Ibid.*) The Ninth Circuit held that the informant became a "state agent" under *Massiah* "when he was placed in [the defendant's] cell after meeting" with the district attorney and police. (*Id.* at p. 1144.) The court, however, explained that "[a]ny statements . . . made by [the defendant] before [the informant] met with the prosecution team cannot be the basis of a *Massiah* violation." (*Ibid.*)

*Randolph* dealt with circumstances far different than that of appellant. While it is true that Gray sought out the district attorney and police, the case similarities between *Randolph* and appellant end there. Prior to Gray's contact with the district attorney, neither the district attorney nor the police were aware that Gray was housed with appellant. (See *Henry, supra,* 447 U.S. at p. 270 ("[T]he FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion"). "[A] defendant does not make out a [*Massiah*] violation . . . by showing that an informant . . . voluntarily[] reported his incriminating statements to the police." (*Kuhlmann v. Wilson, supra,* 477 U.S. at p. 459.)

While appellant may be correct that an agreement between the informant and state is not always necessary to create a "state agent" relationship, *some* knowledge by the state is necessary, lest every prisoner who unilaterally elicits incriminating information from a co-inmate be automatically deemed a state agent under *Massiah*. Gray was not a state agent at the time he obtained incriminating information from appellant, under *Massiah*, *Henry*, and even *Randolph*. (See *Randolph, supra,* 380 F.3d at p. 1144 ("Any statements . . . made by [the defendant] before [the informant] met with the prosecution team cannot be the basis of a *Massiah* violation").)

Here, the prosecution's receipt of the two letters recovered from Gray on December 20, 2010, did not stem from any violation of appellant's right to counsel under the Sixth Amendment. More was needed in this case to create the requisite agency relationship. Indeed, the letters became part of the evidence against appellant due to appellant's decisions to volunteer information about his case and to trust Gray with the job of smuggling letters out of prison. In sum, the government neither "intentionally

21

created" nor "knowingly exploit[ed]" an opportunity to confront appellant without counsel.  (*Maine v. Moulton, supra,* 474 U.S. at pp. 168, 176.)

## II. EVIDENTIARY ISSUES

### A.      *Authentication of the Letters*

Appellant claims the trial court erred in admitting the letters because the prosecution failed to authenticate that they were written by him.  Authentication of a writing is required before it may be received into evidence and before secondary evidence of its contents may be received into evidence.  (Evid. Code, § 1401.) " 'Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law.'  (Evid. Code, § 1400.)" (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1445.)  "[T]he objection that a document has not been authenticated does not go to the truth of the contents of the document, but rather to the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent claims it to be.  [Citations.]" (*Interinsurance Exchange v. Velji* (1975) 44 Cal.App.3d 310, 318; *City of Vista v. Sutro & Co.* (1997) 52 Cal.App.4th 401, 412.)

Evidence Code section 1421 states: "A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the *author* of the writing." (Italics added.)  Section 1421 uses the word "author" and not the word "writer," and a document need not be written by an individual in order for that person to be the author for purposes of authentication.  (*People v. Lynn* (1984) 159 Cal.App.3d 715, 736, fn. 10.)  "Accordingly, it is not necessary for purposes of authentication of a writing that the writing be physically created by the author's hand." (*Ibid.*)  Rather, the circumstances and contents of the writing itself may serve to authenticate it as being authorized by a particular individual.  (*Ibid.*)  "The law is clear that the various means of authentication as set forth in Evidence Code sections 1410-1421 are not exclusive. Circumstantial evidence, content and location are all valid means of authentication

22

[citations]." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372-1373.)

Authentication requires a party to establish as a preliminary fact the genuineness and authenticity of the writing, which can be established by any one of a variety of means. (*Interinsurance Exchange v. Velji, supra,* 44 Cal.App.3d at p. 318.) The establishment of such authentication is a preliminary fact within the meaning of Evidence Code section 403. (*Fakhoury v. Magner* (1972) 25 Cal.App.3d 58, 65.) The proponent of the document has the burden of establishing its authenticity. (Evid. Code, § 403, subd. (a)(3).) The preliminary fact of authenticity is first determined by the trial court but it is subject to redetermination by the jury. (*People v. Fonville* (1973) 35 Cal.App.3d 693, 708-709; Evid. Code, § 403, subds. (a)(3), (c)(1).) We review a ruling that a writing has been sufficiently authenticated for abuse of discretion. (*People v. Smith* (2009) 179 Cal.App.4th 986, 1001; *People v. Daugherty* (2011) 199 Cal.App.4th Supp. 1, 5–6.)

In *People v. Olguin, supra,* 31 Cal.App.4th 1355, the police found rap lyrics in a defendant's home. (*Id.* at p. 1372.) They referred to membership in the Southside F Troop Gang; the defendant was a member of this gang. (*Id.* at pp. 1366, 1372 & fn. 3.) One said, "my name is Vamp," which was the defendant's moniker. (*Id.* at p. 1372 & fn. 3.) Another said, "I[']m that rapper they call Franky"; the defendant's name was Francisco. (*Ibid.*) Finally, they said "I rapp [*sic*] into the beat" and "just give me the mic and I[']ll rock your world," which could have been construed as references to disk-jockeying; the defendant was a part-time disk jockey. (*Ibid.*) For these reasons, the appellate court upheld a ruling that the lyrics were sufficiently authenticated. (*Id.* at pp. 1372-1373.)

Similarly, in *People v. Gibson, supra,* 90 Cal.App.4th 371, the police found a typewritten manuscript in the defendant's hotel room and a handwritten note in her home. (*Id.* at p. 382.) They referred to the author as " 'Sasha,' " which was one of the defendant's aliases. (*Id.* at p. 383.) "Each was written in the first person and each described operating a prostitution enterprise"; there was extrinsic evidence that the defendant was operating a prostitution enterprise. (*Id.* at pp. 382-383.) For these

23

reasons, the appellate court upheld a ruling that the documents were sufficiently authenticated. (*Ibid.*)

Here, much as in *Olguin* and *Gibson,* the author of the letters had identifying information that matched appellant. The author called himself "Spice," which was defendant's moniker. The author referenced he was "Cold Gunnaz Finest"—"Cold Gunnaz" being the name of appellant's gang; appellant had the words "Cold Gunnaz" tattooed on his forearms. The first letter addressed to "Cash Flow," included special "wordz" for "Blast," a known associate of appellant named Chris P. The letter included references to "[Bony] Ralph" White, as well as a six-page summary of White's statement to the police. In the first letter, the author was also concerned about the lack of efforts to retaliate for the attack on "WhiteBoi," who was another known associate of appellant. The second letter was addressed to "Kleet Da Muthafuckin Banga," which is the alias for appellant's cousin, Jason Johnson. In this letter, the author tells Johnson to say that the gun found in the bedroom belonged to him. The author also instructs Johnson that he needs to "put it on a lot thicker" than he did at the preliminary hearing. This was sufficient to support the trial court's finding of authentication.

Admittedly, unlike in *Olguin* and *Gibson,* the writings were not found in appellant's residence or his cell. While it would be helpful additional evidence, it is not a controlling factor. In the instant case, the letters were authenticated pursuant to Evidence Code section 1421. Even if no one saw appellant write the letters and they were delivered to the police by Gray, instead of being found in appellant's cell, the letters stated matters which were unlikely to have been known or authored by anyone other than appellant.

## B.     *Chain of Custody Regarding the Letters*

Appellant contends that the letters should not have been admitted in evidence because there was insufficient evidence of the chain of custody to establish that the letters were what they were purported to be. As the People point out on appeal, appellant failed to object on this ground below. Appellant concedes as much in his briefs but argues that the failure to object constitutes ineffective assistance of counsel.

24

"In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] . . . If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)

Defense counsel's performance was not deficient. An adequate chain of custody was established for admission of the letters, and thus any objection would have been futile. "In a chain of custody claim, ' "[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." [Citations.]' (*People v. Diaz* [(1992)] 3 Cal.4th [495] at p. 559; see also Mendez, Cal. Evidence (1993) § 13.05, p. 237 ['While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering'].) The trial court's exercise of discretion in admitting the evidence is reviewed on appeal for abuse of discretion. (*County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448.)" (*People v. Catlin* (2001) 26 Cal.4th 81, 134, cert. den. *sub nom. Catlin v. California* (2002) 535 U.S. 976, overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242, 1253-1256.)

Appellant has failed to show that any vital link in the chain of custody was missing or to produce any credible evidence of tampering. Detective Marble testified that he waited for Gray in the sergeant's office at the North County Jail on December 20, 2010, at 4:30 p.m. Gray was escorted into the office by members of the Sheriff's Department. He was instructed to show his property to Detective Marble. Gray was in possession of a garbage bag that contained the personal property he acquired while in jail for six months. This included clothing, magazines, and toiletry items. Detective Marble searched the bag looking for letters written by appellant that Gray was supposed to deliver to appellant's friends. He found two envelopes. The envelopes contained the two letters that were admitted into evidence as Exhibits 43 and 44. Detective Marble testified that the letters appeared to be in the same condition as they were when he first observed them in Gray's bag. There is no indication that the letters were tampered with once the police took possession of them. Appellant fails to show anything improper happened to the evidence. To the extent that appellant argues that Gray may have written the letters or altered them, this question goes to authenticity, which, as discussed *ante*, the trial court properly ruled on. Thus, an objection on chain of custody grounds would have been futile. (*People v. Harpool* (1984) 155 Cal.App.3d 877, 886 [counsel is not required to make futile objections or motions]; *People v. Weston* (1981) 114 Cal.App.3d 764, 780 [same]; *People v. Jones* (1979) 96 Cal.App.3d 820, 827 [same].)

## C.     *Relevance of Gray's Absence from Trial*

Appellant contends that his constitutional rights to due process and a fair trial were violated when the trial court admitted evidence regarding Gray's plea bargain and his disappearance during trial.

When Gray disappeared from the courthouse, the prosecutor announced his intention to call David Kelvin, Gray's attorney, to testify about the testimony agreement and the change of plea, as well as Detectives Revel and Marble regarding the consequences of his failure to appear as a witness. Defense counsel agreed that the witnesses could testify that Gray had been present at the courthouse in the morning, but left without their knowledge and did not return. He objected to the introduction of any

26

evidence which could create the inference that appellant was somehow responsible for Gray's failure to appear.

The trial court ruled that the prosecutor could not speculate but could "argue that he's not here and the stakes were pretty high . . . . I don't want them to speculate. I don't want them to speculate. Okay. . . . You can put the facts in front of them. That's it."

Appellant argues that the evidence of Gray's failure to appear at trial, as well as the evidence pertaining to his plea bargain was irrelevant and therefore inadmissible. (Evid. Code, § 350.) Evidence is admissible only if it is relevant. (*Ibid.*) All relevant evidence is admissible, except as otherwise provided by some statutory or constitutional exclusionary rule. (See Cal. Const., art. I, § 28, subd. (f)(2); Evid. Code, § 351.) Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The general test of relevance is whether the evidence tends logically, naturally, and by reasonable inference to establish material facts such as identity, intent, or motive. The trial court retains broad discretion in determining the relevance of evidence. (*People v. Crittenden* (1994) 9 Cal.4th 83, 132, cert. den. *sub nom. Crittenden v. California* (1995) 516 U.S. 849, impliedly overruled on other grounds as stated in *People v. Baldwin* (2002) 189 Cal.App.4th 991, 999-1000.)

In the case before us, the trial court did not abuse its discretion in admitting the evidence of Gray's disappearance and of his plea bargain. As mentioned, appellant agreed that the prosecution witnesses could testify that Gray was present at the courthouse in the morning but left without their knowledge and did not return. On appeal, the People argue that the evidence regarding the plea agreement was relevant to show the severe consequences Gray faced for failing to appear at trial. This evidence, however, had only marginal relevance.

The jury already knew that graffiti in appellant's jail cells accused Gray of being a "snitch." Witnesses testified that the graffiti was a message alerting others that Gray was a snitch and that someone wanted Gray hurt. The jury also knew that Gray had been subpoenaed to testify, was in the courthouse, but disappeared at lunchtime and failed to

reappear. Thus, evidence of the terms of Gray's plea agreement had little impact on the case, especially in light of the overwhelming evidence already presented by the prosecution showing appellant's involvement in the murder of Davis and Parker. Accordingly, any error in admitting evidence relating to Gray's disappearance and the terms of his plea bargain was clearly harmless under federal and state standards. (*Chapman v. California* (1967) 386 U.S. 18, 24 [reversal required unless error harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reversal required if it is reasonably probable jury would have reached a different conclusion had evidence been excluded].)

### III. CUMULATIVE ERROR

Finally, appellant contends that the cumulative effect of the purported erroneous rulings compels reversal.~(AOB 55)~ As we have determined that the trial court did not err in any respect, we need not engage in a cumulative-error review.

### IV. PAROLE REVOCATION FINE

Appellant contends that the trial court erred in imposing a parole revocation fine pursuant to section 1202.45 because that statute is inapplicable in this case. The People agree that the trial court erred in imposing the fine because appellant was sentenced to life in prison without the possibility of parole.

We also agree and order the parole revocation fine stricken. Section 1202.45, subdivision (a), requires assessment of a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and [whose] sentence *includes a period of parole.*" (Italics added.) Because appellant's sentence included no period of parole, it was improper to impose the parole revocation fine. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075; *People v. Battle* (2011) 198 Cal.App.4th 50, 63; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.)

### V. DISPOSITION

The judgment is modified by striking the section 1202.45 parole revocation fine. The trial court is directed to amend the abstract of judgment to reflect this modification

and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
HUMES, J.