Filed 6/27/14  P. v. Jarosik CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047949 |
| v. | (Super. Ct. No. 09HF0875) |
| MARK ALAN JAROSIK, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseno, Judge.  Affirmed.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Mark Alan Jarosik of two counts of forcible rape (Pen. Code, § 261, subd. (a)(2); counts 1, 3),[1] attempted forcible sodomy (§§ 664, subd. (a); 286, subd. (c)(2); count 2), four counts of disobeying a restraining order (§ 166, subd. (a)(4); counts 5, 9,10, 11), attempted murder (§§ 664, subd. (a), 187, subd. (a); count 6), and solicitation to commit murder (§ 653f, subd. (b); count 12). The jury found the allegation that Jarosik acted with premeditation and deliberation (§ 664, subd. (a)) in committing the attempted murder to be true. The jury also found he inflicted great bodily injury on the victim under circumstances involving domestic violence (§ 13700, subd. (b)), and had been released from custody on bail at the time of the offense.

The trial court sentenced appellant to 31 years to life in prison, and on appeal Jarosik challenges the sufficiency of the evidence to support the premeditation and deliberation finding. He also argues jail officials violated his Sixth Amendment right to counsel under *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*) when they placed Jarosik, a cellmate, and a recording device in a jail transport van after the cellmate disclosed Jarosik had solicited his girlfriend's murder before Jarosik attempted to kill her himself while out on bail. Jarosik also argues the trial court erred in failing to strike the cellmate's testimony and the recorded statements, and that he received constitutionally deficient representation because his attorney filed no motion at the outset of trial to exclude the testimony and recording, and did not seek to sever the solicitation charge. As we explain, we affirm the judgment because these contentions have no merit.

---

[1] All further statutory references are to the Penal Code unless noted.

# I

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2005, Jarosik, a married architect in Illinois, met Sarah C., who was also married with children, while visiting Las Vegas, Nevada. They did not begin a sexual relationship that evening, but remained in contact when each returned home. Within six months they began dating long-distance while Sarah finalized her divorce, but Jarosik conducted the affair secretly until his wife confronted him. In the ensuing argument, he choked her with both hands around her neck. The marriage ended, and Jarosik moved in 2007 to live with Sarah in California.

Jarosik obtained a position in an architecture firm initially, but around 2008 or 2009, his income and employability declined with the economy. Jarosik had moved with Sarah and her children into a new home in Ladera Ranch. Their arrangement called for Jarosik to contribute rent, but he did not do so consistently. They argued about money, the relationship deteriorated, and Jarosik soon found himself sleeping downstairs on the couch. Jarosik still told Sarah he went to work daily.

To discuss their differences, Sarah agreed to meet Jarosik at a coffee shop, where she found him speaking with another patron when she arrived. When Jarosik left to get coffee, the woman approached Sarah and told her that, instead of going to work, Jarosik had been meeting her at the coffee shop every day for several months. For Sarah, this was "the straw that broke the camel's back." She asked Jarosik to move out.

Because he had no money and no place to go, Sarah allowed Jarosik to stay in her family's 20-foot travel trailer stored at an Irvine recreational vehicle lot. When he moved out, Jarosik left behind some clothes that he did not use and handed over his house key. Sarah made clear he was not to return to the house without her permission. Jarosik felt belittled that he was forced to stay in the trailer.

Sarah continued to see Jarosik once or twice a week despite her growing fear of him. On one occasion, Jarosik took Sarah for a walk on a trail, became very angry, and would not let her leave. Sarah became afraid and uncomfortable around him.

On May 15, 2009, Sarah allowed Jarosik to use her home computer for his job search. After Jarosik arrived, Sarah left to have dinner with her friends. While at the restaurant, Sarah saw Jarosik drive by twice. She returned home at about 9:30 p.m., saw Jarosik had returned to the computer, and demanded to know why he had followed her. They argued and Sarah told Jarosik to leave when he finished his computer search. Sarah went upstairs to her bedroom, shut the door, and climbed into bed.

Jarosik climbed the stairs, stationed himself outside her bedroom, and argued with Sarah through the locked door. Eventually, he removed Sarah's door handle and forced his way into the room. Jarosik grabbed Sarah by the neck, forced her onto the bed, and began choking her with both hands. Sarah gasped for air and begged Jarosik to stop. With one hand still holding Sarah down, Jarosik forcefully removed Sarah's pants. He then removed his own clothes and raped Sarah multiple times over the span of several hours. Sarah begged Jarosik to stop, but he responded, "You're not going to tell me what to do." Jarosik tried to turn Sarah over onto her stomach several times in an attempt to sodomize her. Sarah managed to prevent penetration each time by flipping back over.

After the sexual assault, Jarosik kept Sarah restrained by maintaining his arms and legs over her all night. Even when Jarosik fell asleep, Sarah felt like she had no escape because the windows in the room were small and high, and Jarosik had removed the bedroom doorknob. The next morning, Sarah told Jarosik she had to leave to attend a funeral. Jarosik responded, "You're not going anywhere," and raped her again. Jarosik eventually allowed Sarah to take a shower, and he put the doorknob back on the door. Sarah exited the shower, dressed, and left the room with Jarosik following

4

her down the stairs. Sarah fled to a friend's house instead of attending the funeral as she had told Jarosik.

Jasonik called Sarah's cell phone several times during the day, but Sarah's friend prevailed on her not to answer. The friend pressed Sarah to call the police, but Sarah was too afraid. That evening, Sarah went to her father's house, where she told her father and brother that Jarosik raped her, and they convinced her to report the incident.

Later that evening, Sarah went to the West Anaheim Medical Center for a rape kit examination. A sexual assault nurse examiner found two bruises on Sarah's legs, redness on the cervix, and a laceration and abrasion on her genitalia consistent with forced sexual intercourse. The examination also yielded Jarosik's DNA on swabs taken from Sarah's mouth and vagina.

On May 17, Sarah participated in three covert telephone calls with Jarosik. During the first covert call, Jarosik denied choking Sarah but did not directly respond to her accusations that he raped her. During the second covert call, Sarah asked Jarosik what he would do if someone did to his daughter what he had done to her. He responded that he would probably "beat the shit out of them. . . ." During the third call, Jarosik agreed to meet Sarah at a specified location where the police arrested him.

The prosecutor charged Jarosik with rape and attempted sodomy by force, and the trial court issued a protective order barring Jarosik from any personal, electronic, telephonic or written contact with Sarah. While in jail, Jarosik discussed with a cellmate the possibility of arranging a hit man to have Sarah killed, but the inmate did not come forward until later, as we describe more fully in the discussion section below.

On June 6, Jarosik gained release on bail. Early the next morning, Jarosik called Gabrielle Amador, Sarah's neighbor, and asked if she could help retrieve his personal belongings from Sarah's house. Amador felt caught off guard by Jarosik's call and responded, "I'll see what I can do. I'll call you back later." Amador promptly went to Sarah's house to inform her of Jarosik's call, and while they were speaking together

upstairs in Sarah's home, Sarah's children began to scream, "Mommy, mommy, somebody is trying to break in the house." Sarah's son saw a man's hand come through the window blinds. The man pulled his hand out and left when the boy began to yell. The police responded immediately and observed the screen at the bottom portion of the downstairs window had been pushed inward and off its tracks. Jarosik later denied he had been anywhere near Sarah's house, but when the fingerprints on the window proved a match, he admitted he was lying.

Meanwhile, on June 8, Sarah dropped her children off at school and told them she would return in a few minutes to attend their school assembly. She drove around the corner to get the mail from her mailbox. As she stopped her car, Jarosik spotted Sarah and ran over to her parked car. As Sarah was exiting her car, Jarosik met her at her open door, and began to strike her in the face and upper body. Sarah fell to the gutter on the side of the street and Jarosik jumped on top of her. Jarosik grabbed Sarah's hair and repeatedly slammed her head against the curb. A neighbor was driving by when he saw the incident unfold. The neighbor jumped out of his car and yelled for Jarosik to stop. Jarosik briefly stopped, looked up, and then continued to slam Sarah's head into the curb. The neighbor dove into Jarosik and wrestled him into a chokehold. Another passerby grabbed Jarosik's feet and the two men restrained Jarosik until police arrived.

Sarah woke up at Mission Hospital, where she was told she had had been in a coma for 11 days. Sarah suffered extreme head trauma, which included a 21.5 centimeter scalp laceration that exposed her skull, and a cerebral concussion. The attack resulted in memory loss, loss of smell, and affected her speech. At the time of the incident Sarah was already in a cast for a broken ankle.

After his arrest, Jarosik waived his *Miranda* rights and told the interviewing officers that on the day of the attack, his mother had dropped him off at a shopping center so she could drive to Sarah's house to pick up his belongings. According to Jarosik, his mother became lost, so he decided to walk to Sarah's house himself. As Jarosik got

6

closer to the house, he saw Sarah drive around a corner and he simply began running toward her. When he confronted Sarah, she screamed, angering Jarosik and triggering the vicious attack.

Jarosik admitted he threw Sarah to the ground but did not recall bashing her head against the curb. He insisted he just wanted to talk to Sarah and did not want to kill her. But when the officers responded skeptically, "You wanted to hurt her. [¶] You attacked her. [¶] And that's why you went over there isn't it true Mark," Jarosik admitted "Yeah."

II

DISCUSSION

A. *Substantial Evidence Supports the Jury's Premeditation and Deliberation Finding*

Jarosik challenges the sufficiency of the evidence to support the jury's conclusion he premeditated the attempted murder. On appeal, we must view the record in the light most favorable to the judgment below. (*People v. Elliot* (2005) 37 Cal.4th 453, 466.) The test is whether a rational trier of fact could reach the verdict on the evidence presented (*People v. Johnson* (1980) 26 Cal.3d 557, 577), not whether the appellate panel is persuaded the defendant is guilty beyond a reasonable doubt. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139 (*Crittenden*).) It is the jury's exclusive province to weigh the evidence, assess the credibility of the witnesses, and resolve conflicts in the testimony. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) Accordingly, we must presume in support of the judgment the existence of facts reasonably drawn by inference from the evidence. (*Crittenden*, at p. 139; see *People v. Stanley* (1995) 10 Cal.4th 764, 792 [same deferential standard of review applies to circumstantial evidence].) The fact that circumstances can be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933 (*Bean*).) Consequently, an

7

appellant "bears an enormous burden" in challenging the sufficiency of the evidence. (*Sanchez*, at p. 330.)

Jarosik concedes he "was so enraged at the moment he attacked Sarah it is possible he wanted to kill her," but he argues the evidence showed only "a mere unconsidered and rash impulse," which "even if it includes the intent to kill, is not deliberation and premeditation." "Deliberation" refers to the actor carefully weighing considerations in forming a course of action; "premeditation" means the actor thought over those considerations in advance. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

The Supreme Court has explained generally that evidence sufficient to "sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior to* the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).)

Jarosik admits the evidence showed a strong motive for him to kill Sarah: he was "extremely angry" with her for what he maintained were false rape charges. He minimizes his motive as "substantial evidence of *only one* of three *Anderson* factors" (italics added), and contends the other factors are absent. Specifically, he argues the record reveals no evidence of planning and that the "attempted killing was hardly accomplished in a particular and exacting manner" reflecting premeditation.

Jarosik's challenge is ill-conceived, however, because the *Anderson* factors are disjunctive, not exhaustive or exclusive; they need not be present in any particular combination, nor is any single factor essential or of definitive weight. (*People v. Pride* (1992) 3 Cal.4th 195, 247; see, e.g., *People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [listing *Anderson* factors in disjunctive]; *People v. Romero* (2008) 44 Cal.4th 386, 401 [same].) The issue on appeal is simply whether a jury reasonably could determine the defendant attempted to kill his victim with preexisting reflection, rather than in a sudden impulse. (*People v. Hughes* (2002) 27 Cal.4th 287, 342.) As the high court has explained, "'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Jarosik minimizes the evidence of premeditation and deliberation, and instead presents the record in the light most favorable to his position, but the standard of review is to the contrary, as noted. The centerpiece of Jarosik's claim is his statement to police that he called a neighbor to obtain his belongings from Sarah's home, so he in turn could retrieve the belongings from the neighbor. And he only entered Sarah's

neighborhood on the day of the attack because his mother and sister could not find the neighbor's home with the directions he provided. And he only happened to encounter Sarah outside her home because she did not adhere to her routine of attending her children's morning assembly at school. And this was after he only happened to surprise the children and Sarah at home the day before by breaking a window by their door and thrusting his hand inside, only to withdraw it and leave when he heard screams. He previously also happened to make arrangements with a cellmate to have Sarah killed.[2] Jarosik contends the only rational conclusion for the jury was that these various quirks of "happenstance . . . belie[d] planning."

The neighbor, however, denied she made any arrangements with Jarosik. It was the jury's prerogative to credit the neighbor's testimony, undermining Jarosik's innocent explanation. The jury similarly could credit the cellmate's testimony that Jarosik sought to hire a hit man. Jarosik argues that his "emotionally explosive attack" on Sarah "was inconsistent with having a plan in place to hire a contract killer." But the jury reasonably could conclude Jarosik became determined to see his murderous designs through himself, either by breaking into Sarah's home as he had done the day before, to lay in wait for her when she returned from the children's school, or with an intent that formed quickly but deliberately when he spied her at the curb, ran to her, surprised her, threw her down, and seized the opportunity to attack her violently.

As Jarosik admitted, the likely outcome of repeatedly bashing Sarah's head against the curb was to kill her, and the jury reasonably could infer Jarosik's unrelenting assault as a passerby attempted to intervene reflected his preexisting design. Jarosik argues the witness's testimony describing him as "wild looking, angry, very angry" with

---

[2] We discuss the specifics of the cellmate's testimony in the next section concerning Jarosik's *Massiah* claim.

"a total loss of control" and a "glazed look in his eyes" supports his position the attack was not premeditated. But the jury could conclude his demeanor in the midst of trying to kill Sarah reflected the difficulty and emotion of doing so, despite his fixed purpose formed before the attack. In any event, even if a defendant's inferences may be plausible, the fact the circumstances may be reconciled with a contrary conclusion does not aid a defendant. (*Bean*, *supra*, 46 Cal.3d at pp. 932-933.) It is the jury's exclusive province to interpret, weigh, and resolve conflicts in the evidence. (*Sanchez*, *supra*, 113 Cal.App.4th at p. 330.) Substantial evidence supports the jury's verdict.

B.     *Massiah*

1.     General Contention, Governing Law, and Summary

Jarosik contends the trial court violated his Sixth Amendment right to counsel under *Massiah* and corresponding state law by failing to grant his belated request to strike the testimony of an informant two days after the People rested their case. (*Massiah*, *supra*, 377 U.S. 201; see § 4001.1, subd. (b) [barring law enforcement from using jail house informants to take any action, "beyond merely listening to statements of a defendant, that is deliberately designed to elicit incriminating remarks"]; see also Stats. 1989, ch. 901, § 4 [noting Legislative intent that this provision be interpreted consistent with *Massiah* and its progeny].) Jarosik contends he received ineffective assistance of counsel when his trial attorney failed to assert a *Massiah* objection earlier and otherwise failed to have the informant's testimony excluded.

"In *Massiah* . . . , the high court held that once a judicial proceeding has been initiated against an accused and the Sixth Amendment right to counsel has attached, any statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against the defendant. [Citations.]" (*People v. Coffman*

11

*and Marlowe* (2004) 34 Cal.4th 1, 66-67.) "To prevail on a *Massiah* claim, a defendant must show that the police and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Id.* at p. 67.)

The *Massiah* right, however, is "offense-specific." (*People v. Thornton* (2007) 41 Cal.4th 391, 433.) It applies only to preclude questioning concerning the offense on which judicial proceedings have been initiated (*ibid.*), not other matters. In other words, "the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses." (*Texas v. Cobb* (2001) 532 U.S. 162, 171-172.) The *Massiah* right does not apply to other offenses even if they are closely related to a charged offense. (*People v. Martin* (2002) 98 Cal.App.4th 408, 414 (*Martin*).) Nor does it apply when the informant acts on his or her own initiative in eliciting information from the accused. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1247 (*Fairbank*); accord, *Martin* at pp. 415-416 [no *Massiah* violation where police instructed witness simply to turn on recording device whenever the defendant telephoned her, and she "conducted a very sophisticated interrogation on her own," delving beyond the defendant's threats against her].) Whether the informant acted as a government agent impermissibly interrogating the defendant on charged crimes is "'an essentially factual question, and we review it on a deferential standard.'" (*Fairbank*, at pp. 1247-1248; *Martin*, at pp. 420-421 [appellate court defers to trial court's factual finding that no agency relationship existed].)

Here, as we explain in more detail below, a jail inmate who had shared a cell with Jarosik after his initial arrest for rape and attempted sodomy came forward following the attempt on Sarah's life and told jail officials Jarosik had solicited his help to kill someone. The inmate, Timothy Ryan, had not been sure whether Jarosik was

12

serious about hiring a hit man to kill his girlfriend, but upon learning of the attack on Sarah from a news account, he approached the authorities and agreed to engage Jarosik in a recorded conversation to see if Jarosik was still willing to "pony up," i.e., pay for Sarah to be murdered. The prosecutor already had added attempted murder to the rape and sodomy charges on which Jarosik had been arraigned in his first jail stint, but Jarosik had not yet been arraigned on the new charge. On the day of his arraignment, jail officials arranged to transport Jarosik and Ryan together in a van where a recording device had been hidden. Jarosik had not been charged with soliciting murder.

The investigator who prepared Ryan for the ride with Jarosik directed him to avoid interrupting Jarosik and instead to let him speak. The investigator did not provide any specific questions for Ryan to ask, and did not request that he elicit any details concerning the charged crimes. To the contrary, the only directions the investigator gave Ryan were to continue the solicitation conversation with Jarosik. Ryan confirmed he was asked to see if he could engage Jarosik in conversation about whether he still wanted to hire someone to kill his girlfriend. Ryan testified he was not told what to say, and was instructed to avoid encouraging Jarosik or forcing him to speak.

Because Jarosik had been charged with rape, attempted sodomy, and attempted murder at the time Ryan spoke with him, his right to be free from government interrogation without the assistance of counsel applied under *Massiah* to those charges. (See *People v. Woods* (2004) 120 Cal.App.4th 929, 939 [noting Sixth Amendment right to counsel attaches during adversarial judicial proceedings against a defendant, upon the filing of formal charges].) But because the *Massiah* right is offense specific, it did not insulate Jarosik from questions about soliciting Sarah's murder, and because the government here did not direct or encourage Ryan to elicit information from Jarosik

13

about the pending charges, anything he volunteered to Jarosik concerning those charges or solicitation of murder was not subject to exclusion under *Massiah*. Jarosik's challenge therefore fails.

2. Details of Ryan's Initial Encounter and Subsequent Interview with Jarosik

We set out the relevant facts consistent with the deferential standard of review. (*Fairbank*, *supra*, 16 Cal.4th at pp. 1247-1248.) Ryan recently had pled guilty to possession of marijuana and possession of hydrocodone for sale and faced about two more months in jail when he was placed in a holding cell with Jarosik on June 5, 2009, after Jarosik's arrest on charges of rape and attempted sodomy. Jarosik lamented that an altercation with a "stupid bitch" had landed him in jail. He was agitated, but warmed to Ryan, disclosed he had a "problem," complained he needed to make the problem go away, and wished aloud he could "get rid of" his girlfriend. Jarosik eventually asked Ryan, "Well, since you're into drugs, do you know anybody that could kill anybody." Ryan, although taken aback, answered affirmatively but with a noncommittal, "Let me see what I can do."

Jarosik and Ryan exchanged booking numbers and Jarosik told Ryan he would write him a letter containing Sarah's name, vehicle information, and possibly her address. Ryan ran into Jarosik a second time in the day room the next day, but Jarosik said he forgot the letter. Ryan was not sure whether to take Jarosik seriously. Later, Ryan saw on the news that Jarosik had been bailed out of jail and rearrested for attempted murder. The news report shocked Ryan, and he alerted a jail sergeant about his encounter with Jarosik.

Ryan met with an investigator briefly on June 10, 2009, explaining he did not put any stock in Jarosik's statements until he saw the news report. On June 15, 2009, he met with another detective, Mark Sarnes, who questioned Ryan aggressively about what he hoped to gain for himself in disclosing his contact with Jarosik. Ryan admitted

14

he came forward in part out of concern that if Sarah died, he would be implicated in the murder. He also explained he felt bad for Sarah and did not want to be associated with her death. Ryan suggested he could secretly record Jarosik soliciting Ryan's aid, again, to kill Sarah. He noted he expected no reduction in his sentence, since he only had two months remaining. He broached the idea of a reduced probation term or a flight at his own expense instead of a nine-hour bus ride to Mendocino County, where he faced other charges, including committing a lewd act on a child under 14 years of age. He did not condition his cooperation on any of these terms, and he was neither promised nor received any consideration for his assistance.

Another investigator, Joe Sandoval, prepared Ryan for his ride on July 1, 2009, in the van with Jarosik. Sandoval "[b]asically told [Ryan] to continue the conversation that was already generated by Mr. Jarosik, just continue the conversation and try not to interrupt him too much, let him talk." Sandoval did not give Ryan "any specific lines to say," nor "any other further direction."

During the ride, Jarosik asked Ryan if he had read about him in the papers. Ryan said that he had not read anything because the jail was on lockdown. Ryan then asked why Jarosik never gave him the letter. Jarosik explained that it was because his mom had bailed him out. Ryan grabbed a pencil and paper and said, "You never gave me her address." Jarosik replied, "Oh shit, let me give it to you." Jarosik told Ryan Sarah's address and described what vehicle she drove. Ryan explained that if Sarah died, Jarosik's case would go away because "there's no victim, there's no witnesses there's no crime…" Jarosik responded that he changed his mind about having Sarah killed and just wanted someone to "set her up," not "take her out."

Ryan explained that his cousin has been taking people "out" for a long time without ever being caught and assured Jarosik that no one would find her. Ryan told Jarosik that without a witness, a good attorney would argue that Jarosik never raped Sarah, but instead had consensual sex with her. Jarosik responded, "Well it wasn't yeah

15

I mean that's yeah it was consensual for me." He later stated, "I can't believe she even re-, reported me to begin with… saying I fucking did that. She's fucking . . . it was consensual sex and she said she was beaten. I'm like . . . no your fucking ex-husband said that there's nothing on you he saw you the next morning you're fucking full of shit . . . . It was all money . . . . I wasn't paying the rent . . . she got pissed off at me . . . . I know that's why she did it, to get out of the, get out of the relationship . . . ."

Jarosik briefly described attacking Sarah. He said, "I lost it man when I . . . went there . . . she was right in front of me and I, I went to grab her and she just . . . freaked on me . . . she fell to the ground and she hit her head and there was blood . . . and then I'm like I'm down on the ground all of a sudden I get picked up and I'm like what the fuck?" He continued, "[S]he drove right . . . passed [*sic*] me . . . . And I'm like are you fucking kidding me and . . . I uh, just freaked out . . . ." He added, "I cannot fucking believe I got picked up again . . . . My mother freaked she was there too . . . . My sister was there, she freaked." He later admitted to Ryan that he never should have pursued Sarah. Ryan told Jarosik that he should have written him instead and Ryan's cousin could have taken care of that. Jarosik said, "Well . . . . I'll just see how it goes, but I mean if I get life in this fucking place for sure . . . ."

Ryan asked Jarosik if he wanted to wait a few days to finish their discussion. Jarosik did not answer the question but instead replied that Sarah was really attractive and his cousin would not miss her because "she stands out like a fucking sore thumb anywhere." He then told Ryan, "[I]f I knew I was getting life in here or something like that no parole it'd be an easy decision for me."

Jarosik asked how much money Ryan's cousin would want. Knowing Jarosik was "strapped on cash," Ryan explained Jarosik probably could pay with a return favor, such as driving a car across state lines. Jarosik then disclosed Sarah's first and last name, and described her hair color, eye color, height, and weight. Jarosik said he did not want Sarah to be found, he wanted her killing to be dragged out, and he wanted her to

16

know that she "fucked up bad." Jarosik expressed that he did not want to be in prison until he was 70 years old and agreed that Sarah needed to be killed before his trial. Jarosik told Ryan all he wanted was an opportunity to make money, see his kids, and bring them out to California, but now he couldn't do that "because of some fucking whore…" Jarosik then expressed interest in seeing Sarah murdered in person or on videotape, and announced he would like to watch the videotape of Sarah's murder for Christmas.

Jarosik expressed disgust that Sarah would have the opportunity to marry a rich doctor, have a great life, and have new children while he would be "rotting in the fucking hole for 40 years." Jarosik told Ryan that he already knew what he wanted to do when he got out with Sarah. Ryan responded, "[Y]ou wanted to kill her too huh." Jarosik replied, "I wanted to go after her. I was thinking about just . . . . I wanna kill her . . . . I wanted to chop her up, put her somewhere and be done with it you know, put her in a fucking box alive, bury six feet down, let her think what she's done."

At the end of the conversation, Ryan asked Jarosik, "So you want me to do the [unintelligible]?" Jarosik said, "Yeah." Ryan warned, "Okay . . . once I start there's no stop." Jarosik replied, "That's okay." Jarosik and Ryan agreed to stay in touch.

3.     Procedural History

Jarosik's trial counsel noted in a pretrial hearing potential *Massiah* concerns with admission of the recorded van conversation, but expressly declined to object for tactical reasons, presumably based on Jarosik's statements tending to show he acted in the heat of passion, including "I lost it man" and "I uh, just freaked out." Two days later, the trial commenced and toward the conclusion of the People's case, the jury heard Ryan's testimony and the recorded van conversation. Two days after Ryan gave his testimony and the People had rested, and after Jarosik concluded his own testimony in

17

his defense, Jarosik's trial counsel reconsidered his pretrial decision and moved to strike Ryan's testimony and the recording.

Counsel explained: "I don't think it's a stretch to say that things come out at trial or things are said at trial, whether it's specific words or in how they are spoken that just don't read the same way in the police reports or the transcripts. It comes out, I don't know [how] to put it, I would say more colorful, more fleshed out, for lack of a better word. [¶] The problem with this statement as it stands now after the witnesses have testified, is that it is impossible, and I also think intellectually naive to sit back and think that that statement isn't going to be used with regard to the attempt[ed] murder charge . . . . [¶] . . . I think when I made the decision [initially], I made my record, and I stand by it. I think as an attorney you have to sit back and say, hey, what's the relative exposure of attempted murder versus solicitation, and there are things in that statement that I'm seeking now to have suppressed, stricken, that help me in the argument against a life count. And when I made the decision . . . , my thought was, you know, buy the life count and maybe fall on the sword on the solicitation count which carries a lot less exposure. I understand . . . I can't have it both ways. [¶] Given the state of the evidence as it's been brought out on the stand, I lose some of that argument which I originally wanted. But based on the entirety of the evidence as it stands and based how the witness testified and all that, I find myself in a position where I would be remiss if I didn't seek to have that testimony stricken and proceed with the evidence that I have, and I'll submit it."

The trial court acknowledged counsel may have thought he had a tactical basis at the outset for declining to object to the recording and Ryan's testimony, but the court concluded the motion was untimely. The court explained: "I don't purport to evaluate the tactics or strategy of counsel for defendant, but there [are] quite a number of

18

statements by the defendant in that recording that would, if believed and accepted by the trier of fact, would constitute provocation and, therefore, give the basis for a lesser included to count 6 of attempted voluntary manslaughter. [¶] I suspect that might have been motivation for letting the tape be played to the jury, and . . . letting [in] Ryan and the defendant's testimony as to that. I can't say that that's the total consideration, but I'm not critical of counsel for defendant's strategy or tactics throughout the proceeding. I simply feel that having made that judgment and proceeded, you can't at the end of the day say I'd like to erase it, it's impossible. So I think that the timing is a key factor." The court expressed practical concerns about whether after a belated objection, the jury could be expected to excise Ryan's testimony and the recording from its considerations, including perhaps the manner in which it gauged Jarosik's testimony with the preceding evidence in mind. In any event, the trial court concluded, "Essentially, the basis of my ruling is that the motion is untimely."

4.     Contentions on Appeal

Jarosik insists the trial court erred in concluding his strike motion was untimely and could not be granted effectively with an admonition to disregard the testimony and the recording. As the Attorney General notes, the decision rested in the trial court's sound discretion. (*People v. Boyette* (2002) 29 Cal.4th 381, 423-424 ["The requirement that an objection to the evidence be timely made is important because it 'allows the court to remedy the situation before any prejudice accrues'"].) The Attorney General argues that the trial court could not "unring the bell" so late in the proceedings, while Jarosik relies on the general presumption that juries will follow the trial court's instructions, citing *Richardson v. Marsh* (1987) 481 U.S. 200, 210 [jury not to speculate on redaction of reference to the defendant in a nontestifying codefendant's confession],

19

and similar cases. Jarosik also argues that because the recorded conversation "painted a very ugly picture" of him with "many, many highly inflammatory passages," no competent attorney would have failed to assert a *Massiah* objection to exclude the evidence at the outset. The Attorney General for her part emphasizes the wide latitude afforded to a trial attorney's tactical decisions, and argues that even if the recording and Ryan's testimony had been excluded, the result inevitably would have been the same.

We need not resolve these contentions because as we noted above, there was no *Massiah* violation. Accordingly, even if counsel had timely objected, Jarosik would not have been entitled to relief. Put another way, the trial court was not required to strike Ryan's testimony or the recording to safeguard Jarosik's Sixth Amendment right to counsel. Because the *Massiah* right is offense specific, it did not apply to the uncharged solicitation offense, and therefore Ryan was entitled to continue his conversation with Jarosik on that topic.

The fact that Jarosik alluded to the other offenses in soliciting Sarah's murder does not change the result because the Sixth Amendment does not extend to preclude an informant from broaching discussion of uncharged offenses that are "closely related to," inextricably intertwined with," "very closely related factually [to]," or "factually interwoven with" the charged offenses. (*People v. Slayton* (2001) 26 Cal.4th 1076, 1082 (*Slayton*).) The result would be different if the police had *instructed* Ryan to delve into the charged offenses because he would be acting as a government agent interrogating a defendant on topics to which the Sixth Amendment attached, a quintessential *Massiah* violation. (See *Maine v. Moulton* (1985) 474 U.S.159, 177, fn. 13 ["'the functional equivalent of interrogation'"].)

The result might also be different if Ryan acted as a paid government informant.  (*United States v. Henry* (1980) 447 U.S. 264, 274; but see *id.* at p. 271, fn. 9 [noting exception where informant does not purposefully elicit information].)  But here the evidence showed unequivocally that Ryan approached jail officials on his own to raise the idea of recording Jarosik and that he was not a paid informant, nor did he receive other remuneration.  Later cases have also clarified *Henry*'s holding to allow police agents to engage defendants directly on uncharged offenses, even if they have been charged with other related offenses.  (*Cobb*, *supra*, 532 U.S. at pp. 171-172; *Slayton*, *supra*, 26 Cal.4th at p. 1082.)  As the court in *Cobb* explained, it "meant what it said" in earlier cases that "the Sixth Amendment right is 'offense specific'" and therefore did not preclude questions on uncharged offenses even if "'closely related to'" or "'inextricably intertwined with'" charged offenses.  (*Cobb*, at pp. 164, 173.)

Jarosik argues Ryan must be viewed as a government agent because one of the initial investigators Ryan spoke with after alerting jail officials of their first jail cell conversation believed Ryan's role was to "elicit incriminating statements" and "get [Jarosik] to admit to things he did do."  We are not persuaded for several reasons.  First, Investigator Sarnes made these remarks in his testimony in the context of explaining that he questioned Ryan whether he was "willing to ask [Jarosik] what he's willing to pony up," which Ryan answered affirmatively.   The expression "pony up" refers to making a payment and, viewed naturally and in the light most favorable to the judgment, refers to the solicitation offense, i.e., whether Jarosik was still willing to pay to have Sarah killed.  It does not refer to eliciting incriminating information on charged offenses, as Jarosik suggests.  Second, Sarnes only participated in the initial interview with Ryan, where jail officials attempted to determine the contours of Ryan's alleged information and whether

he was credible or simply wanted to be paid in some fashion.  Sarnes did not participate in preparing Ryan for his conversation with Jarosik, and the officer who did, Joe Sandoval, did not direct Ryan to elicit any information on the charged offenses, but only to continue his solicitation conversation with Jarosik.

Jarosik suggests that because the trial court based its ruling on the untimeliness of his strike motion, and expressed no opinion on the merits of his *Massiah* claim, the ordinary, deferential standard of review does not apply.  In other words, Jarosik argues that because the trial court never expressly concluded Ryan was *not* a government agent subject to *Massiah*'s restrictions, there is no lower court determination to which we must defer.  We must presume, however, that the judgment is correct unless the appellant affirmatively demonstrates error.  (*People v. Garza* (2005) 35 Cal.4th 866, 881, citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  As discussed, nothing in the record *requires* the conclusion Ryan was instructed, or otherwise acted as a government agent, to elicit information from Jarosik on the charged offenses rather than the uncharged solicitation offense.  Consequently, there was no *Massiah* error or ineffective assistance of counsel in belatedly moving to strike purported *Massiah* evidence.

Finally, Jarosik also argues trial counsel rendered constitutionally deficient representation by expressly declining to seek a bifurcated trial on the solicitation offense. The claim is without merit, however, because a bifurcation motion would have been futile.  The relevant factors in deciding whether to sever charges are:  "(1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined

22

charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 27-28.) "A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice" from the joinder of substantive counts. (*Id*. at p. 28.) Here, the evidence of solicitation would have been admissible in bifurcated proceedings to prove the attempted murder charge, and vice versa. Because the evidence was cross-admissible, Jarosik's claim fails.

## III

## DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.

23